**Bruce LIPPO, d/b/a "Walden-Woodfield Service Station", Plaintiff-Appellant,**

v.

**MOBIL OIL CORPORATION, Defendant-Appellee.**

**No. 85–2770.**

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1986.

Decided Oct. 7, 1986.

Rehearing Denied Nov. 14, 1986.

Michael R. McKenna, Chicago, Ill., for plaintiff-appellant.

James M. Mulcahy, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellee.

Before CUDAHY, FLAUM, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

For approximately nine years plaintiff-appellant Bruce Lippo (Lippo) operated a gasoline service station in Schaumburg, Illinois, as a franchisee of the defendant-appellee Mobil Oil Corporation (Mobil). This case arises from the parties' failure to renew the franchise agreement upon the expiration of its term. From October 1, 1979 through September 30, 1982 the franchise relationship between Lippo and Mobil was governed by a contract, a service station lease, and several other documents executed on March 1, 1979, as well as the Petroleum Marketing Practices Act, Pub.L. No. 95–297, 92 Stat. 322 (1978), codified at 15 U.S.C. §§ 2801–2841 (PMPA or "the Act") which became effective upon enactment on June 19, 1978. During March 1982, Mobil presented Lippo with proposed franchise documents for a three-year term beginning October 1, 1982. The key element for purposes of this action was the proposed rental amount. Lippo did not execute the proposed documents. On March 26, 1982, Mobil sent Lippo a notice of non-renewal.

Lippo commenced this action alleging that the nonrenewal violated the contract and the PMPA. Summary judgment was granted in favor of Mobil. Lippo has appealed, contending that Mobil's refusal to renew the franchise agreement violated the PMPA. For the reasons set forth below, we see no error in the district court's rulings and therefore affirm.

According to the contract and supporting documents, Mobil had the unconditional right not to renew the franchise. However, the PMPA, which must be read into the contract and lease, was enacted to protect petroleum franchisees from overbearing and discriminatory termination practices by franchisors. *See, e.g., Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1220 (7th Cir. 1982).

The relevant portion of the Act provides:

(b)(3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if:

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

15 U.S.C. § 2802(b)(3)(A).

■ In a civil action under the PMPA, the parties' burdens are clearly delineated. The franchisee has the burden of demonstrating: (1) the existence of a franchise relationship; (2) his status as a franchisee; and (3) the nonrenewal of the franchise relationship by the franchisor. Then, "[t]he franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such ... nonrenewal was [permissible] under section 2802(b)...." 15 U.S.C. § 2805(c). *See* H.R.Rep. No. 95–297, 95th Cong., 2d Sess. 41, *reprinted in* 1978 U.S. Code Cong. & Ad. News 873, 899. The focus in this case is whether Mobil's proposed changes to the franchise agreement were made in good faith, in the normal course of business, and not as a pretext for nonrenewal. *See, e.g., Munno v. Amoco Oil Co.,* 488 F.Supp. 1114 (D.Conn.1980). The franchisor's obligation to deal in good faith has been recognized as a subjective one:

[I]t is appropriate to note that considerable debate has focused upon recognition of so-called "reasonable business judgments" of the franchisor as grounds for termination or non-renewal. This standard has not been adopted by the committee. Instead, a two-fold test has been utilized to judge certain specified determinations....

One test is whether the determination was made "in good faith." This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The

second test is whether the determination was made "in the normal course of business." Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself.

Senate Report No. 95–731, 95th Cong. 2d Sess. 37, *reprinted in* 1978 U.S. Code Cong. & Ad. News 873, 895–96. *See also Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1222 (7th Cir.1982); *Siecko v. Amerada Hess Corp.*, 569 F.Supp. 768, 771–72 (E.D. Penn.1982); *Palmieri v. Mobil Oil Corp.*, 529 F.Supp. 506, 511–12 (D.Conn.), *aff'd*, 682 F.2d 295 (2d Cir.1982); *Bellmore v. Mobil Oil Corp.*, 524 F.Supp. 850, 853 (D.Conn.1981); *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1118–21 (D.Conn.1980).

On appeal, both parties allege that their adversary misrepresented the pertinent facts. We find no such misrepresentation, but rather that the parties disagree on the inferences to be drawn from the relevant facts. Summary judgment should not be substituted for a trial on the merits. Instead, summary judgment is proper and will be upheld on appeal when the pleadings and supporting papers in the record demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant for summary judgment bears the burden of establishing the absence of a genuine issue of material fact and the entitlement to judgment as a matter of law. *E.g., Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1218 (7th Cir.1984). All doubts are to be resolved against the movant. The non-moving party's reasonable allegations are to be accepted as true for purposes of summary judgment. *E.g., United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Based on the foregoing standard, the following facts are apparent from the record.

In early March, 1982 an Area Manager (Boyer) and a Marketing Representative (Chowdhury) of Mobil met with Lippo to explain the proposed terms of a new franchise agreement between Mobil and Lippo. However, the final copies of the documents were not reviewed at that time. On March 17, 1982 Boyer and a different Marketing Representative (Perry) brought the documents pertaining to the franchise renewal to Lippo at his service station and a meeting was arranged for March 24, 1982 to obtain the executed copies of the agreement from Lippo. Boyer later contacted Lippo to request an earlier meeting date, but Lippo advised that his attorneys had the documents and no meeting could be held until the following week. Boyer then advised Lippo that it was imperative to meet the week of March 22, 1982 as Mobil, pursuant to the requirements of the franchise documents and the PMPA, 15 U.S.C. § 2804(b)(2), was required to give notice of nonrenewal to Lippo 180 days prior to the expiration of the current agreement if they could not agree on new terms. Mobil sent such a notice of nonrenewal to Lippo on March 26, 1982 citing the parties' inability to reach agreement on the terms of the renewal documents, particularly the rent requirement. No meeting was apparently held to discuss the final franchise agreement documents although Mobil stated its willingness to continue to discuss the proposed agreement in the nonrenewal notice.

Lippo filed this suit on June 24, 1982 challenging Mobil's failure to renew the franchise agreement and seeking injunctive and declaratory relief as well as compensatory and punitive damages. In two orders resolving the numerous issues presented, the district court granted summary judgment in favor of Mobil. Lippo contends that the proposed changes were not formulated in good faith in the normal course of business, but rather were a pretext for nonrenewal. He further asserts that the failure to agree on the new franchise provisions was caused by Mobil's lack of good faith and its discriminatory treatment of him in violation of the PMPA. In support of these allegations, Lippo challenges (1)

certain components of the station rent calculation, namely, the gasoline profit center (GPC) profit margin and gasoline volume; and (2) the conduct of Mobil during the renewal period.

## RENT CALCULATION

The major dispute between Lippo and Mobil involved the annual rent requirement in the proposed contract; particularly the GPC component. GPC includes profits from the sale of gasoline and is derived using the following formula:

1) The Department of Energy (DOE) Base Period Volume for the dealer from November 1, 1977 through October 31, 1978 is ascertained.

2) The dealer's actual gasoline sales for 1980 are determined.

3) The larger of 1) or 2) is used as the "normal" volume for the dealer.

4) Mobil then determines a projected gasoline profit margin based on present margins, personal observation, experience, and good business judgment.

5) The figure determined in 4) is multiplied by that determined in 3) to arrive at the dealer's projected gross profit from the sale of gasoline.

6) The projected gross profit number is then "plugged into" a standard GPC Rent Schedule to determine the annual rental.

The GPC component of his annual rent was calculated by Marketing Representative Chowdhury. Lippo's DOE base period volume was 1,283,725 gallons and his 1980 sales volume was 1,079,563 gallons. Under the Mobil formula, then, the DOE figure was used. Lippo's projected profit margin for the GPC was determined to be 10.22 cents per gallon. The projected profit margin was formulated based on "present margins, personal observation, experience, and good business judgment." The district court noted that the projected margin figure was slightly lower than Lippo's actual margins. Multiplying the projected profit margin by Lippo's DOE volume yielded a gross profit figure of $131,205. Based on Mobil's standard GPC Rent Schedule, this was converted to an annual rent of $25,963,

or $2,163 per month. Because the increase was incrementally applied, Lippo's GPC rent would be $1,937 per month in the first year and thereafter would be the full amount of $2,163 per month.

## GPC PROFIT MARGIN

Lippo claimed that Mobil determined his projected GPC profit margin in a discriminatory fashion, not as a result of its normal decisionmaking, in violation of the PMPA. Particularly, he asserts on appeal that Mobil failed to adhere to its own policy that the assigned profit margin should be competitive and compatible with projected sales volume. He identifies an allegedly similarly situated Mobil dealer (Fredenhagen) with an assigned GPC profit margin of 7.0 in support of his claim of discriminatory treatment.

Lippo complains, as he did in the district court, that Mobil's projection of a high sales volume and a profit margin of 10.22 cents per gallon to calculate GPC rent ignores the relationship between price and volume. He asserts that he cannot sell the projected volume of gasoline at the stated profit margin. Thus, he contends that Mobil's projected profit margin determination was not based on the exercise of good business judgment. Further, he argues that Mobil ignored its own policy by computing a GPC profit margin which was not competitive and incompatible with the projected volume.

As we have previously stated, this Court will not, indeed cannot, review the objective reasonableness of a franchisor's actions. We cannot second-guess the business decision of a franchisor to force a dealer to lower its prices (which is what Lippo argues he must do to meet the projected sales volume). Moreover, so long as the proposed charge is not being used to disguise an illegal attempt to discriminate against a franchisee and drive him from business, the court has no power to interfere. "If ... a good faith application of a rental formula operates unreasonably in a particular case, the dictates of the marketplace alone will govern the transaction."

*Munno,* 488 F.Supp. at 1119. The figures used were projections based on Mobil's business judgment as well as historical data of the station's profitability. Lippo has failed to persuade us that his assigned profit margin figure was incompatible and uncompetitive vis-a-vis the volume figure.

■ Lippo also claims he was treated differently from a similarly situated dealer in the Chicago area, Fredenhagen. Lippo compares his 1981 volume of 511,694 gallons to Fredenhagen's projected volume of 575,000 gallons during his first year of operation. He also compares his 10.22 cents per gallon GPC profit margin with Fredenhagen's projected 7.0 cents per gallon GPC profit margin. We agree with the district court's conclusion, however, that Lippo and Fredenhagen were not similarly situated. Mobil stated that Fredenhagen's lower profit margin rate was based upon the following facts: (1) Fredenhagen was a new dealer; (2) the service station premises were under construction; (3) he held a trial franchise for a one-year period only; and (4) the station was being converted from a partial self-serve operation to a full self-serve operation. Lippo had a partial self-service station which, according to Mobil, has generally higher profit margins than full self-service stations. We reiterate that the margin is Mobil's projection of a station's profitability and Mobil's explanation for the difference is plausible. Lippo does not persuade us otherwise. Indeed, Lippo's assigned profit margin was within the range for others with partial self-serve operations. The projected profit margin was also below Lippo's actual margin at the time the projection was made. Thus, Fredenhagen's dissimilar treatment does not constitute evidence of discriminatory treatment actionable under the PMPA. We hold therefore that Lippo's projected profit margin was calculated in good faith and in the normal course of Mobil's decisionmaking.[1]

### GASOLINE SALES VOLUME

■ Lippo next contends that Mobil failed to apply two programs which would have affected his GPC rent. Initially, he asserts Mobil failed to present a worksheet used in its contract preparations (the Contract Gasoline Volume Adjustment Request) to Lippo to inform him of the possibility of rent adjustments and meaningful negotiations. This argument is meritless. While the PMPA precludes discriminatory and arbitrary treatment by franchisors, a franchisee must take some action to protect his rights. Lippo does not contend he initiated any dialogue or negotiation even though the rent formula was entirely new. He apparently did not even inquire about the calculations. Mobil is only obliged to act in a nondiscriminatory manner, not to put its dealers' interests ahead of its own.

■ Lippo also contends Mobil improperly failed to apply an amendment ("March 8th Amendment") for computing normal volume to him. The formula applied to Lippo defined the maximum contract volume as the higher of the DOE defined base period volume or the 1980 calendar year volume. Mobil changed this determination on March 8, 1982:

> *Maximum:* The maximum will be normal volume which is defined as the realistic potential of the location operating under normal marketing conditions. The realistic potential would be the best projection for the location assuming a competitive pricing posture and applying the other retail factors such as hours, service and appearance in a reasonable manner.

Plaintiff asserts that defendant discriminated against him by failing to apply the new, more favorable formula in determining his future rental amount. Mobil's re-

---

1. We view with disfavor Lippo's numerous allegations of misrepresentation by Mobil during this litigation. There certainly appears to be a difference of opinion between the parties over the relative importance of station configuration in the projections, but we have found no evidence that Mobil misled the court. Indeed, Lippo asserts Mobil made misrepresentations on three factual issues but describes only two in his brief.

sponse is that (1) the new formula was not applied retroactively; (2) the time pressure made it impossible to apply the new "normal volume" formula; and (3) the rent under the new formula would have been the same.

The record contains evidence that Lippo's contract renewal package was prepared and discussed with him prior to March 8, 1982. Lippo has offered no evidence to show that he was treated differently from other dealers whose contract renewal documents were prepared prior to March 8, 1982 nor to rebut Mobil's assertion that it routinely applied amendments to its nationwide rental policy prospectively only. The "normal volume" computed for Lippo's successor in October, 1982 was also identical to the figure used in Lippo's renewal documents. Moreover, Lippo made no showing that application of the March 8th Amendment would have affected his GPC rent and thus led to a renewal agreement with Mobil.

## MOBIL'S CONDUCT

■ Lippo's final assertion is that Mobil's conduct during the renewal period is circumstantial evidence of its discriminatory intent. He specifically cites Mobil's delay in presenting the renewal documents to him and its failure to advise him in writing that a unilateral rent adjustment program would be applicable to him on renewal. This conduct does not support Lippo's claim of discrimination. Lippo made no apparent effort to negotiate when presented with the renewal documents, taking the position instead that Mobil must continue the franchise agreement under the 1979 terms if no other agreement could be reached. Further, the rent adjustment program was initiated in April 1981 as a temporary measure and cancellable by Mobil at any time. We have found no evidence that Mobil engaged in a campaign to harass Lippo in order to force him out of business in retaliation for his "independent retail pricing policy."

AFFIRMED.