**John H. DUFF and Prairie Brook Marathon, Inc., a corporation, Plaintiffs,**

v.

**MARATHON PETROLEUM COMPANY, a corporation, Defendant.**

**No. 91 CV 7992.**

United States District Court, N.D. Illinois, Eastern Division.

April 8, 1994.

Aram A. Hartunian, Steven P. Schneck, Futterman & Howard, Chtd., Chicago, IL, for plaintiffs.

David L. Doyle, Erin K. Higgnis, Pope, Cahill & Devine, Ltd., Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiffs John H. Duff and Prairie Brook Marathon, Inc. (collectively referred to as "Duff") bring this action against Marathon Oil Company (Marathon), alleging that Marathon brought about the termination of Duff's franchise in violation of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* Before this court is Marathon's motion for summary judgment. Federal subject matter jurisdiction is based on 28 U.S.C. § 1331. For the reasons stated below, Marathon's motion is granted.

## PROCEDURAL HISTORY

This action was initially filed on December 13, 1991. Duff sought injunctive relief and exemplary damages against Marathon. Marathon moved for summary judgment, which was granted by the district court in its memorandum and order of June 11, 1992. Duff moved for reconsideration and his motion was denied on June 19, 1992.

On appeal, the Seventh Circuit vacated the district court's judgment, stating that while there may in fact be nothing to Duff's claims the district court's opinion was not "usable." *Duff v. Marathon Petroleum Co.*, 985 F.2d 339, 341 (7th Cir.1993). The circuit court was disturbed by the fact that the district court failed to address the key issue in the case: whether Marathon employees manipulated the numbers keyed into the computerized rental program to produce a rental amount Duff could not afford. *Id.* While acknowledging that the evidence presented on this issue was not of the most probative nature (Duff's own deposition), the circuit court stated that it "appeared" that Duff had raised a genuine issue of material fact. *Id.* It therefore remanded the case, with directions that further proceedings be conducted by a different judge. The case is now before this court and Marathon has again moved for summary judgment.

## FACTS

Marathon owns its gas stations and leases them to dealers such as Duff. Duff leased and operated a Marathon service station located in Palatine, Illinois. He is the sole owner of the shares of Prairie Brook Marathon, Inc., the company through which the station was operated.

Duff operated under a three-year lease from April 1981 to March 1984, a one-year lease from April 1984 to March 1985, and a three-year lease from April 1985 through March 1988. From 1981 through 1988, Duff's rent increased from $1,254 a month to $1,533 a month, for a total increase of 22% over the seven-year period, or roughly 3% per year. In 1988, his monthly rent increased to $2,146, a 40% increase from 1987. Marathon continued to raise the monthly rent in the following years: $3,160 a month in 1989 for a 47.25% increase; $3,579 a month in 1990 for a 13.26% increase; $4,441 a month in 1991 for a 24.08% increase; and $6,217 in 1992, for a 40% increase. Marathon's rental policy provides that the monthly rental amount is not to be raised more than 40% per year, with two exceptions. An increase of greater than 40% would be permitted if a station received capital improvements since the previous rental calculation, or if the dealer chose to pay the greater increase in order to participate in Marathon's rental rebate program.[1] For example, Duff's rent increased by more than 40% in 1989 because he elected to participate in the rental rebate program.

Duff alleges that Marathon sought to terminate his franchise in retaliation for a personal injury suit he filed against Marathon in 1985. He was awarded damages of $148,246 in that lawsuit. Duff maintains that the rent increases were part of a scheme by Marathon to terminate his franchise. He alleges that the numbers which Marathon's employees keyed into the computer for the rental calculations were "jiggered" in order to produce a rental figure that he could not afford and, as a result, he was forced to terminate his franchise.

In 1987, Marathon implemented a computer-driven rental formula to compute rental amounts for all of its branded lessee-dealers. The basic elements of this formula have not changed since that date and it is applied to all its branded lessee-dealers. The formula is designed to ensure that Marathon receives its desired ROI at each dealer location.[2] Marathon has submitted numerous docu-

---

1. This rental rebate program provides a credit of $.02/gallon for every gallon that a dealer purchases over the monthly gallonage required to provide Marathon with its required return on investment (ROI) at the station. This credit is applied towards the dealer's rental amount for the following month, serving to reduce the dealer's "net" rental.

2. In the years 1984 to 1989, Marathon's desired ROI rose from 13% to 15%, and then again to 16%. During 1990, Marathon's desired ROI increased to 17.5%, where it remains today.

ments and affidavits to help explain how this rather complicated computer program operates.

Many components of the rental formula, known as "standard assumptions," are identical for each dealer and represent averages of overhead costs incurred by Marathon in operating each of its branded dealerships. Examples of costs treated as standard assumptions are credit card transmittal charges, salesperson expenses, maintenance expenses, per gallon profit margins and bad debt expenses. For the purposes of rental calculation, Marathon does not assess these costs for each individual location but instead uses an average of these costs across the lessee-dealer system. Standard assumptions are computed and entered into the rental program by Marathon personnel at the Brand Division headquarters located in Findlay, Ohio.

Other components of the rental formula, entered by personnel at the district office level, are: (1) the dealer's current contract rental amount; (2) the dealer's net rental income amount; (3) the dealer's average monthly purchases of gasoline and other Marathon products over the preceding 12-month period; (4) the per gallon freight cost incurred by Marathon in delivering product to the station; (5) the historical cost of the property to Marathon; (6) the average monthly property tax expense incurred by Marathon on the property over the preceding 12-month period; and (7) the appraised value of the leased premises.

All of the figures necessary to perform the rental calculation, with the exception of the land and building appraisal values, are obtained from a document known as the dealer's "Profit and Loss Data Sheet" (P & L sheet). P & L sheets record sales and marketing data for each Marathon dealer over a 12-month period. They are produced at the Findlay, Ohio, office, using a computer program that accesses data contained in Marathon's accounting records. Updated sheets are forwarded to district level personnel on a monthly basis.

Marathon's real estate department is responsible for conducting land and building appraisals on a regular basis. Real estate representatives appraise all dealership properties at fair market value, taking into account the "highest and best use" of the property. After completing an appraisal of a dealership property, a real estate representative fills out a "Property Information" form. These forms are filed by administrative personnel and the appraisals are used by personnel in the tax, accounting and marketing divisions. Marathon's appraisals are also used by Brand Division personnel as a source for the building and land values that are entered into the rental program.

For rental calculation purposes, Marathon does not use the actual fair market value of the dealership buildings. Dealership buildings are assigned a set value, depending on the number of service bays on the premises. Each two-bay building is assigned a set value of $25,000, while each three-bay building is assigned a set value of $35,000. District level personnel also use the property information form to obtain a dollar figure for land market value. In addition, from 1987 through 1991, a "tank surcharge" figure was included in the calculation. The tank surcharge was a supplemental charge assessed to all lessee-dealers in an attempt to recover for Marathon the cost of replacing underground fuel storage tanks. This charge was dealer-specific, calculated based on the age of the dealer's tanks and the anticipated year of replacement. In 1991, Marathon began to assess an identical tank surcharge to each of its dealers but did not apply this new method of calculation retroactively.

Duff's main dispute with Marathon's rental calculation lies in the appraised value of the building and land. Duff alleges that this figure was manipulated to increase his rent and drive him from his franchise. Marathon, on the other hand, maintains that Duff's rent was calculated in the same manner as every other branded lessee-dealer.

Duff further contends that—also as a part of the scheme to drive him from his franchise—Marathon refused to adequately repair and modernize his station. Specifically, he alleges that Marathon refused to perform necessary repairs and improvements, or to cooperate with modernization of the premis-

es. Duff maintains that Marathon acknowledged that these repairs and improvements were necessary and promised to take care of them, but failed to do so. Meanwhile, Duff alleges, Marathon provided maintenance, repair and modernization to other dealers in Illinois. Duff contends that Marathon's failure to maintain and improve his station impaired his ability to sell gas and related products and services because customers found his comparatively rundown service station unappealing.

## DISCUSSION

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1388 (7th Cir.1993). Rule 56(c) requires entry of summary judgment if the non-moving party fails to come forth with evidence to refute the moving party's allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The party opposing the motion must do more than merely raise "some metaphysical doubt as to the material facts" in order to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Even though all reasonable inferences are drawn in favor of the party opposing the motion, a scintilla of evidence in support of the non-movant's position will not defeat a motion for summary judgment. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir.1991).

The Petroleum Marketing Practices Act (PMPA) limits the power of oil companies to terminate their franchised dealers. Termination is permitted, however, if the franchisor and franchisee fail to agree to changes or additions to the provisions of the franchise, provided that such changes result from "determinations made by the franchisor in good faith and in the normal course of business" and not from a desire to prevent the renewal of the franchise. 15 U.S.C. § 2802(b)(3)(A). This is a twofold test. The "good faith" test is subjective and meant to preclude sham determinations from being used as an artifice for termination or non-renewal. *Lippo v. Mobil Oil Corp.*, 802 F.2d 975, 977 (7th Cir.1986), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1374, 94 L.Ed.2d 689 (1987); *Grotemeyer v. Lake Shore Petro. Corp.*, 749 F.Supp. 883, 890 (N.D.Ill.1990). The "normal course of business" test, on the other hand, requires that the changes be the result of the franchisor's normal decisionmaking process. *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1119 (D.Conn.1980), citing Senate Report No. 95–731, *reprinted in* 1978 U.S.Code Cong. and Admin. News, pp. 873, 895–96. These tests serve to protect franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the franchisor's business judgment itself. *Grotemeyer*, 749 F.Supp. at 890.

The relevant inquiry is not whether the proposed changes were "reasonable." *Lippo*, 802 F.2d at 977. The court is not to assume the role of a rate-review agency; it looks to the franchisor's intent, not the effect of its actions. *Munno*, 488 F.Supp. at 1120. If a "good faith application of a rental formula operates unreasonably in a particular case, the dictates of the marketplace alone will govern the transaction," and the court should not interfere. *Id.*

## I. Rent Increase

It is Marathon's burden to establish that the rent increase was made in good faith and in the ordinary course of business, and that it was not part of a scheme to terminate Duff's franchise. 15 U.S.C. § 2805(c). Duff admits that it is Marathon's business practice to calculate rental amounts with a standardized computer formula but he denies that, in his case, the formula was uniformly applied.[3] He alleges that Marathon inflated the ap-

---

**3.** The court notes that Duff does not really deny that the same rental formula is applied to all Marathon dealers. He is not challenging the existence of a standard formula itself, or the fact that this formula was applied to him. Rather, he alleges that certain figures were manipulated *before* being plugged into the formula.

praised value of the premises in order to make his station's rent unaffordable.[4] Marathon argues, on the other hand, that the increase in Duff's rent cannot be attributed to any animus on its part or to any manipulation of the figures entered into the rental formula. It maintains that the formula is uniformly applied to all of its dealers, including Duff, and that Duff was not treated any differently than any one else.

Marathon has produced numerous documents and affidavits in order to demonstrate the standardized nature of its rental formula and explain how it works. Edward Markel, Mark Schimmoeller and John Thompson supplied affidavits detailing where the numbers plugged into the formula come from. Markel and Thompson are financial analysts with Marathon's Brand Division in the Findlay, Ohio, office. Schimmoeller was the administrative supervisor at Marathon's Illinois district office from February 1988 to June 30, 1992.

Markel and Thompson explained that many of the figures input into the formula are identical for each dealer in the system. These figures, called "standard assumptions," are averages of overhead costs incurred by Marathon in operating each of its branded dealerships. The standard assumptions are entered into the formula by personnel at the Findlay, Ohio, office who have little, if any, contact with individual dealers.

The remaining figures are keyed in by district level personnel. Schimmoeller explained that all of these figures are taken directly from each dealer's P & L sheet, except for the land and building appraisal value. P & L sheets are produced at the Findlay office using a computer program that accesses data contained in Marathon's accounting records and then forwarded to district-level personnel (Thompson Aff., ¶ 14).

The land and building appraisal value is determined by Marathon's real estate department. Marathon includes an affidavit from former employee Peter Allesee, who conducted appraisals for the real estate department. Allesee states that the department is staffed and supervised independently of other Marathon departments, and that its representatives have no day-to-day contact with or responsibility to personnel employed by other Marathon divisions. Allesee appraised Duff's station in January 1991. He states that he appraised Duff's station in the same manner that he appraised every other station, and that he had no knowledge of Duff's 1985 personal injury suit at the time of the appraisal and no discussions were had with anyone at Marathon regarding Duff or his station. He has never met Duff.

■ Based on the evidence Marathon has presented, the court is persuaded that Marathon utilizes a standard formula when making its rental calculations and that this formula is applied uniformly to all of its branded lessee-dealers. Duff has produced no evidence to dispute the existence of this formula, or the fact that it was applied to him. Duff maintains, however, that Marathon intentionally inflated the value of his station in an attempt to manipulate the rental calculation and drive up the monthly rent.

In support of this contention Duff points to the 62.5% increase in appraised value of his station from 1987 to 1992. He maintains that other stations in his area did not receive similar increases. He contends that the appraisals for other stations remained steady while his increased dramatically. However, the evidence submitted by Duff on this is misleading. Station 2353's appraised value increased by 87.5% from 1987 to 1992, while station 2333 experienced a 55% increase. The appraised value of station 2359 increased

---

4. Duff also states that material issues of fact remain with respect to manipulation of figures input for property taxes, underground storage tank replacement charges, and gasoline purchases. He claims to be saving his argument on these issues until trial. However, Duff cannot escape summary judgment by promising to establish the existence of material facts with regard to these matters at trial. Under Fed.R.Civ.P. 56(e), he is required to set forth, in his briefs in opposition to summary judgment, specific facts which show that there is a genuine issue for trial. The failure to do so will result in an entry of summary judgment, if it is otherwise appropriate. By failing to present evidence on these issues now, Duff has effectively waived them for the purposes of this motion. Accordingly, the court will address only the claim that the land appraisal value was inflated.

by 66.67%, and station 2399's appraised value jumped up 59% during this period. Yet, these stations were omitted from Duff's summary of land appraisal values. A complete reading of the evidence makes clear that, contrary to Duff's assertions, many of the stations' appraised land values increased dramatically, several by greater percentages than his own. Nearly every station experienced an increase of more than 30%. These figures do not establish that the value of Duff's station was inflated.

In a further attempt to demonstrate that his station was overvalued, Duff compares his station to station 2366, which is located 2.4 miles from his station in Arlington Heights. Both stations have three service bays. Duff alleges that although station 2366 is twice the size of his station, it was given an appraised value of only $225,000 in 1992 while his station was valued at $325,000. This argument is unpersuasive, however, because station 2366 is not twice the size of Duff's station. On one of Marathon's documents, station 2366 is erroneously listed as having 87,200 square feet. But numerous other real estate documents show that the actual size of that station is only 25,400 square feet. Duff's station, on the other hand, has 45,150 square feet, making it larger than station 2366 by 19,750 square feet. Given the true proportions of the two stations, the disparity in appraisal values does not raise a genuine issue of material fact. Moreover, Allesee states that a number of factors besides size come into play when making a land value appraisal. These are the possible alternative commercial uses of the property, the prospects for short-term and long-term growth in the vicinity of the station and the comparable square footage values of other commercial property in the vicinity.

Allesee's affidavit states that Duff's dealership premises were by far the largest in the Illinois district. Yet it had the third lowest assessed value per square foot of the ten stations appraised by Allesee in early 1991. Allesee suggests that, if anything, Duff's station is undervalued rather than overvalued. Given the large size of Duff's property it was suitable for other commercial uses, such as fast-food franchises, which could not be developed on some of the smaller dealership properties. Moreover, at the time of the appraisal Palatine was considered a rapidly developing but not overdeveloped commercial area. In making his appraisal Allesee considered property in Palatine to be more valuable than property in more "saturated" areas such as Arlington Heights.

Duff's response to Marathon's evidence and sworn testimony is insufficient to survive summary judgment. Duff's expert computer systems analyst John Storto examined Marathon's rental formula. He states in his affidavit that the current market value of the building and land is a significant figure in the calculation. He states that the increase in the appraised value can account for the entire rent increase. In addition, Gary Cartwright, who was district manager of the Illinois district office from March 1990 to June 1992, testified in his deposition that, all other factors being equal, the more the land was worth the greater the rent.

These facts, however, are not dispositive. While it may be true that the increase in rent can largely be attributed to the higher appraisal value, Duff has presented no evidence that suggests that the value of his station was inflated. He has failed to provide any proof of animus or to show that he was singled out for discriminatory treatment. It is not enough to show that his rent increased dramatically after he filed a personal injury lawsuit against Marathon. Marathon has presented evidence that Duff was treated no differently than any other dealer. It has submitted sworn affidavits and other documents which show that the land value appraisal and proposed rent increase were calculated in good faith and in the normal course of business.

Under the PMPA, Marathon does not need to prove that the rent increases were reasonable, only that they were made in the ordinary course of business and not as a pretext for termination of the franchise. See *Lippo,* 802 F.2d at 977. It is true that Duff experienced substantial rent increases from 1987 to 1992, but other stations experienced similarly high increases and *every* station's rent was calculated according to a standard formula.

Marathon has met its burden and Duff has failed to raise a genuine issue of material fact.

## II. *Failure to Maintain and Improve the Station*

Finally, Duff alleges that as part of its scheme to terminate his franchise Marathon refused to make necessary repairs and improvements to his station. Duff alleges that Marathon provided maintenance, repair and modernization to other dealers in Illinois but refused to do the same for him. He contends that his station was unappealing to customers because it was not adequately maintained or modernized and as a result he sold less gas and related products and services, thereby driving up the cost of his rent.

Duff appears to be alleging that Marathon refused to improve and repair his station in an attempt to constructively terminate his franchise. While the PMPA does not explicitly recognize that conduct short of an actual termination or nonrenewal will subject a franchisor to PMPA scrutiny, this type of claim has been recognized by the courts. See *DuFresne's Auto Serv., Inc. v. Shell Oil Co.,* 992 F.2d 920, 927 (9th Cir.1993). Franchisees who allege constructive termination must comply with the PMPA's one-year limitations period. *Id.* Thus, for Marathon's conduct to be actionable under the PMPA, Duff was obligated to bring suit within one year after the later of (1) the date of termination or nonrenewal, or (2) the date the franchisor fails to comply with the requirements of §§ 2802 or 2803 of the Act. 15 U.S.C. § 2805(a). Because Duff did not file this claim until December 1991, his claims for failure to repair or improve from 1985 to December 1990 are barred by the PMPA's limitations period. Accordingly, Duff can only challenge Marathon's conduct from January to December 1991.

█ Marathon cannot be held liable if the alleged failure to repair and modernize was due to determinations made in good faith and in the ordinary course of business. *See* 15 U.S.C. § 2802(b)(3)(A). Marathon has submitted documents which show that it spent $7,749.22 for maintenance, repair and improvements to Duff's station in 1991. It is true that greater sums of money were spent on some of the other stations. However, more money was spent on Duff's station than on 15 of the 47 other Illinois district stations. Moreover, several stations received *nothing* by the way of repairs or improvements in 1991. Even more telling is a look at 1990, where Marathon spent $37,344.21 on Duff's station. This was more than was spent on 38 of the 47 other Illinois district stations. This does not mean that Marathon made all the improvements or performed all the repairs that Duff felt were necessary. However, under the PMPA, Marathon need not demonstrate that it complied with all of Duff's requests, it need only show that it treated Duff in the same manner as its other dealers. This Marathon has done.

Duff alleges that Marathon modernized several stations located near him (we are not told when) but refused to modernize his station. However, there is no evidence that suggests that Duff's station was the only one Marathon failed to modernize. On the contrary, the evidence shows that Duff fared better than many other dealers in terms of repairs and improvements. In the absence of any evidence that Duff was singled out for the improper denial of repairs and improvements, this court cannot find that a genuine issue of material fact exists.

### CONCLUSION

Marathon's motion for summary judgment is granted.