John H. DUFF and Prairie Brook Marathon, Incorporated, Plaintiffs–Appellants,

v.

MARATHON PETROLEUM COMPANY, a corporation, Defendant–Appellee.

No. 94–1930.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1994.

Decided April 6, 1995.

Aram A. Hartunian (argued), Hartunian & Associates and Steven P. Schneck, Chicago, IL, for plaintiffs-appellants.

Joseph A. Strubbe and David L. Doyle (argued), Phelan, Pope, Cahill & Devine, Chicago, IL, for defendant-appellee.

Before FLAUM, RIPPLE and GARZA,* Circuit Judges.

RIPPLE, Circuit Judge.

This case is before us for the second time. We assume familiarity with the facts set forth in our first opinion, *Duff v. Marathon Petroleum Co.*, 985 F.2d 339 (7th Cir.1993)

---

* The Honorable Emilio M. Garza, United States Circuit Judge for the Fifth Circuit, is sitting by designation.

("*Duff I*"). In relevant summary, Marathon Petroleum owns its gas stations and leases them to franchisees. Mr. Duff operated a Marathon service station in Palatine, Illinois from 1981 until June 1992. Mr. Duff is the sole shareholder of Prairie Brook Marathon, Inc., the company under which the service station was operated [hereinafter collectively referred to as "Mr. Duff"].

From April 1981 until March 1984, the station was leased under a three-year agreement; from April 1984 until March 1985 under a one-year agreement; and from April 1985 until March 1988 under another three-year agreement. In a normal agreement offer, Mr. Duff was given the option of paying either a lower one-year rent or a higher three-year rent. The advantage of signing a longer agreement was that it fixed rent for a period of three years. During the course of the seven-year period from 1981–1988, Mr. Duff's rent consistently increased. Ultimately, in 1991, Marathon offered Mr. Duff the option of signing a one-year lease at $6,217/month or a three-year lease at $6,838/month. Mr. Duff refused to execute a new lease, and, in December 1991, Marathon sent Mr. Duff a notice of non-renewal pursuant to 15 U.S.C. § 2804(c) of the Petroleum Marketing Practices Act.

Mr. Duff filed his original complaint for injunctive and monetary relief against Marathon that same December. Mr. Duff alleged that Marathon sought to terminate his franchise in retaliation for a successful personal injury suit that he had filed against Marathon. In that lawsuit, he received damages of $148,246. Mr. Duff further alleged that the constant rental increases were part of a scheme to terminate constructively his franchise; Mr. Duff claimed that certain data calculations were manipulated in order to produce rental rates that he would not be able to afford. Despite the pending litigation, in January 1992 Marathon once again offered Mr. Duff the option of signing a one or three-year lease at the rental rates previously calculated.

In *Duff I*, this court noted that the district court had failed to address the principal issue

in the case: whether Marathon's employees keyed manipulated data into the computer program used to produce rental rates for franchisees in order to inflate Mr. Duff's rates, and consequently, to "punish [Mr. Duff] for his temerity in having sued Marathon." *Duff I*, 985 F.2d at 341. We held that summary judgment could not be based solely on a showing that "the rental figure was produced by the same formula used for all Marathon's dealers...." *Id.* Because the district court did not consider the issue of manipulation, we vacated the initial summary judgment decision. We were unable to discern whether an issue of material fact existed. We concluded, "It is possible therefore that a careful sifting of the evidence and perhaps a reopening of the record for additional discovery or affidavits will show that there is indeed nothing to Duff's case." *Id.* Thus, we left open the possibility that further analysis may indicate that the values entered into the computer system were manipulated, thus inflating artificially Mr. Duff's rent to an exorbitant extent.

On remand, the district court again granted summary judgment for Marathon. The district court held that Mr. Duff was unable to demonstrate that there was a genuine issue of triable fact with respect to whether Marathon had manipulated the rental calculation formula used to determine his rental increase. In addition to examining the affidavits of Marathon personnel that described how the rent had been calculated, the district court concluded that the statistical data Mr. Duff presented to substantiate his claim was misleading. Mr. Duff omitted data that detrimentally impacted his claim, and he presented no evidence that the appraised value of his station was inflated. Consequently, the court determined that Mr. Duff had not been treated differently from other dealers and that summary judgment was appropriate.

▮ The Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.*, is designed to protect the franchisee of a service station from unfair termination practices by

petroleum company franchisors.[1] Under the terms of the statute, the franchisee station owner has the initial burden of showing that the franchise has been terminated or not renewed. The franchisor then has the burden of going forward by establishing that it is entitled to one of the affirmative defenses set forth in the Act. 15 U.S.C. § 2805(c). ·Among those defenses is that the nonrenewal is based on the failure of the parties to agree to changes in the franchise arrangement that result from "determinations made by the franchisor in good faith and in the normal course of business." 15 U.S.C. § 2802(b)(3)(A). In applying the criteria of this subsection, we must keep in mind that Congress intended to protect franchisees from arbitrary or discriminatory decisions of nonrenewal. It did not give the court the authority to second-guess the wisdom of business decisions. *Baldauf v. Amoco Oil Co.*, 553 F.Supp. 408, 412 (W.D.Mich.1981), *aff'd*, 700 F.2d 326 (6th Cir.1983). As Judge Flaum noted, writing for the court in *Lippo v. Mobil Oil Corp.*, 802 F.2d 975, 977–78 (7th Cir.1986), our task in a case such as this one is to apply a two-pronged analysis. We must determine whether the franchisor's action was taken in good faith and was made in the normal course of business. If both of these tests are met, the action cannot be said to have been taken as a pretext for nonrenewal.[2] As noted in *Lippo*, an examination of whether the franchisor acted in good faith is necessarily a subjective test. It is intended to preclude sham determinations from being used as an artifice for nonrenewal. The second inquiry, whether the decision was made in the normal course of business, requires an examination of the franchisor's normal decision-making process. As our discussion in *Duff I* demonstrates, although these two inquiries are usually stated separately, they do not exist in hermetically sealed containers. Deviation from the normal course of doing business is, of course, highly relevant and probative evidence on the issue of good faith.

■■■ On motion for summary judgment, it is the responsibility of the nonmoving party to identify specific facts to establish that there is a genuine triable issue. *Johnson v. Runyon*, 47 F.3d 911, 916 (7th Cir.1995). On appeal, unless there is evidence sufficient to sustain a jury verdict in favor of the nonmoving party, the grant of summary judgment must be affirmed. *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994).

■■■ With the above substantive and procedural standards in mind, we now turn to the case before us. It is not disputed that Mr. Duff met his initial burden of demonstrating the existence of a franchise, his status as a franchisee, and the nonrenewal of the franchise by Marathon. Marathon then met its burden of going forward by raising and supporting the affirmative defense that its decision had been made in good faith and in the normal course of doing business. Marathon produced "numerous documents

---

**1.** 15 U.S.C. § 2802(b)(3)(A) provides:

(b)(3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

**2.** *See, e.g., Lippo v. Mobil Oil Corp.*, 802 F.2d 975, 981 (7th Cir.1986) (holding that oil company's even-handed refusal to apply a more favorable formula in computing gasoline volume for purposes of establishing rental rates in a renegotiated franchise did not establish that the franchisor discriminated against the franchisee); *see also Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 788 F.Supp. 616, 622 (D.Mass.1992) (holding that no lack of good faith is shown merely because franchisor chooses to appraise his leased properties in a way that reflects the opportunity cost of leasing such premises as service stations as opposed to more efficient, profitable use); *Ackley v. Gulf Oil Corp.*, 726 F.Supp. 353, 368–69 (D.Conn.) (holding that where substantial rental increases imposed by franchisor in good faith were calculated pursuant to the same, uniform mathematical formula, no violation of the Petroleum Marketing Practice Act existed), *aff'd*, 889 F.2d 1280 (2d Cir.1989), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 941 (1990).

and affidavits in order to demonstrate the standardized nature of its rental formula and explain how it works." R. 119 at 9. It also produced evidence to demonstrate that the computation of the rental formula was not manipulated to obtain a figure other than the one that Duff would otherwise have been assigned as a result of the process.

Central to Marathon's presentation was the affidavit of the Marathon real estate appraiser, Peter Allesee. Mr. Allesee, during his employ with Marathon, was responsible for appraising Mr. Duff's station. This affidavit was especially important because, as stated in affidavit by Duff's expert computer systems analyst, John Storto, current market value of the building and land is a significant figure in the disputed rental calculation formula, and the inputted value could account for the entire rent increase affecting Mr. Duff. R. 106, Ex. G at 2–3.[3]

Mr. Allesee's affidavit established that the Marathon real estate department conducted all the station appraisals. The department is staffed and supervised independently of any other Marathon division; its personnel have no regular contact with, or responsibility to, personnel employed in other Marathon divisions. Additionally, Allesee's affidavit verifies that all appraisals of station property were conducted similarly according to a "highest and best use" standard. Considerations used in the calculus included the size of the lot, possible alternative commercial uses of the property, the prospects for growth in the area around the station, and comparable square foot values of other commercial property in the area. The building structure itself was assigned a set value, dependent on the number of service bays contained in the structure. At the time he made his evaluation, Mr. Allesee did not receive instructions from anyone in Marathon to appraise differently Mr. Duff's station. He had no discussion with anyone at Marathon regarding Mr. Duff's station or Mr. Duff's personal injury lawsuit against Marathon. R. 99, Ex. 5 at 2–3. Further, Allesee's affidavit suggested that Duff's appraisal value per square foot was relatively low compared to other appraisals in the Illinois District, and thus the statistics may have indicated that the station was undervalued rather than overvalued. R. 99, Ex. 5 at 5; R. 119 at 13.

■ Faced with Marathon's submission, supported by evidence, that it had calculated the terms of the new lease in good faith and in the normal course of its business, it was incumbent on Duff to come forward with evidence that placed in question the truth of Marathon's submission. *Cf. Lippo*, 802 F.2d at 981 (noting that franchisee had obligation to refute franchisor's assertion that it had treated its franchisees evenhandedly). After independently examining the record, we believe that the district court correctly analyzed this evidence of record, and correctly concluded that Mr. Duff had failed to contradict this evidence sufficiently to survive summary judgment. Mr. Duff has failed to submit evidence to support his contention that Marathon's explanation is pretextual and that the rental increases were imposed in retaliation for his having filed a tort suit against Marathon. Because no substantive evidence places in question the affirmative defense of Marathon, the district court correctly deter-

---

**3.** In 1987, Marathon implemented a Lotus spreadsheet model to compute all dealer-franchisee rental amounts. The formula was and is currently applied to all franchisees, and has remained unchanged generally since its implementation. The model is designed to ensure a minimum return on investment ("ROI") for Marathon at each dealer location. From 1984–1989, Marathon's desired ROI increased from 13% to 15%, and then to 16%. During 1990, Marathon increased its ROI to 17.5%, where it has remained through the pendency of this case.

Personnel in Marathon's Ohio headquarters input "standard assumptions" into the model, which represent averages of overhead costs incurred by Marathon in operation of each of its dealerships, and are identical for each dealer. Also inputted is data that is dealer-specific and obtained from Company records. This data includes the dealer's net rental income amount, the dealer's average monthly purchases of gasoline and other Marathon product over the preceding 12 months.

This data, with the exception of the land and building appraisal values, is taken from a document termed the "Profit & Loss Data Sheet"—a sheet produced at Marathon headquarters using another computer program that accesses data contained in Marathon's accounting records.

mined that summary judgment was proper.[4] Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

4. We do note, however, one discrepancy in the district court analysis that, although not sufficiently significant to alter the outcome of this case, warrants mention. Mr. Duff submits on page 21 of his appellate brief that, regarding property value appraisals, "[t]he statement that nearly all of the stations showed at least a 30% increase from 1987 to 1992 is wrong." This assertion references a section of the district court opinion in which it was explained that Mr. Duff's allegations that his rental rates were inflated were not supported by the figures he presented. *See* R. 119 at 11–12. In fact, only 10 of the 23 Illinois Marathon stations appraised experienced over a 30% increase in land value from 1987 to 1992. However, of the nine other stations that experienced such substantial increases, Mr. Duff's increase was not disproportionate. Thus, this discrepancy, standing alone, does not create a genuine issue of triable fact.