C.T. MASSEY d/b/a C.T. Massey Oil Company; B.W. Lyons Oil Co., Plaintiffs–Appellants,

v.

EXXON CORPORATION d/b/a Exxon Company, U.S.A., Defendant–Appellee.

No. 88–6335.

United States Court of Appeals, Sixth Circuit.

Argued July 15, 1991.

Decided Aug. 14, 1991.

Stuart A. Handmaker (argued), Seiller & Handmaker, Louisville, Ky., Eugene Goss, Goss & Goss, Harlan, Ky., for plaintiffs-appellants.

Robert G. Abrams (argued), Gaspare J. Bono and Joseph P. Lavelle, briefed, Howrey & Simon, Washington, D.C., Gregory L. Monge, Van Antwerp, Monge, Jones & Edwards, Ashland, Ky., for defendant-appellee.

Before GUY and NORRIS, Circuit Judges, and FRIEDMAN, District Judge.[*]

RALPH B. GUY, Jr., Circuit Judge.

Plaintiffs C.T. Massey Oil Company and B.W. Lyons Oil Company appeal the judgment of the district court granting summary judgment for defendant, Exxon Corporation, and dismissing their claims for wrongful termination of a franchise brought pursuant to 15 U.S.C. § 2801 *et seq.* Upon a review of the record, we affirm the ultimate holding, although we reject a portion of the district court's analysis.

### I.

The plaintiffs were two of seven franchised wholesale distributors of Exxon products in Kentucky. Prior to the developments which precipitated this action, each had been operating under the provisions of written franchise agreements—a series of one-year contracts—the last of which was for the year ending March 31, 1981.

In March of 1981, Exxon wrote individual letters to both plaintiffs and to the other franchisees in Kentucky, informing them that Exxon would offer them three-year contracts for the period beginning April 1, 1981. Plaintiffs received these contracts in May 1981. Massey received his on May 21 and signed and returned it the same day. It subsequently was signed by R.L. Mize for Exxon on May 29. Lyons received his contract on May 5, which he also signed and returned. It was countersigned on

---

[*] The Honorable Bernard A. Friedman, United States District Court for the Eastern District of Michigan, sitting by designation.

May 28. Both contracts provided that they were "entered into" as of the dates of their respective signings by plaintiffs. Each agreement stated that "[t]he Agreement shall be in full force and effect for the period of three years beginning on the 1st day of April, 1981, and ending on the 31st day of March, 1984."

In June 1982, Lyons had entered into a separate agreement with Exxon to purchase a gasoline station from the company. The agreement included a provision by which Lyons would, as part of the consideration for the sale, release Exxon from any future claims and liability. This sale was completed in October 1982.

On August 25, 1982, Exxon issued a statement that it would withdraw from the sale of branded motor fuel in Kentucky and four other states. According to Exxon, this determination was made as a result of market changes in the petroleum industry. Plaintiffs were notified of the decision earlier in the day. On March 28, 1983, both plaintiffs received formal notices under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq., of termination of their franchises effective October 14, 1983, the date of Exxon's withdrawal.

On August 2, 1984, Massey filed suit under the PMPA to recover damages caused by Exxon's termination of his franchise. On January 4, 1985, Lyons was granted permission to intervene. Exxon filed a counterclaim seeking to recover more than $98,000 for Exxon products sold to Massey. Massey filed a voluntary petition in bankruptcy. These latter actions are not part of this appeal.

After substantial discovery by both parties, Exxon moved for summary judgment against both Massey and Lyons. It also moved for summary judgment against Lyons on the independent ground that he had executed a release that discharged his claim. Both motions were subsequently referred to a magistrate for a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(a). On December 12, 1986, the magistrate recommended that the motion on the release issue be granted. On July 23, 1986, he issued a second report and recommendation which suggested that Exxon's second motion on the PMPA issue should also be granted. The district court issued an opinion on October 21, 1987, adopting the reports and recommendations as its findings of fact and conclusions of law, and granted summary judgment.

Plaintiffs raise four claims of error on appeal: (1) that the court improperly construed the contracts entered into by plaintiffs as contracts for a term of three years or more within the meaning of the PMPA; (2) that Exxon's withdrawal from Kentucky was not made in good faith; (3) that Exxon's decision to withdraw was based on facts which occurred prior to the signing of the contract; and (4) that Lyons' claim was not barred by the release.

## II.

We review a district court's grant of summary judgment under a *de novo* standard of review. *EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). We examine the grant of summary judgment to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989) (citation omitted). Although we must draw all justifiable inferences in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), there must be a disagreement regarding a *material* fact. *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir. 1986). The evidence presented must be sufficient to permit the plaintiff to recover if accepted by the jury.

Congress enacted the PMPA in 1978 to create a uniform set of rules covering the grounds for termination and non-renewal of motor fuel marketing franchises, and "to protect 'franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 (7th Cir.1982) (citing S.Rep. No. 731, 95th Cong.2d Sess. 15,

*reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 874).

The franchise relationship in the petroleum industry is unique in that the franchisor commonly not only grants a trademark license and supplies the products but also leases the service station premises to the franchisee. As Congress noted, "[t]his relationship is, therefore, often complex and characterized by at times competing interests." *Id.* at 17, U.S.Code Cong. & Ad.News at 875. Congress designed the PMPA to allay three specific concerns: that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one. *Id.* at 17–19, U.S.Code Cong. & Ad.News at 875–77.

The PMPA prohibits termination of any franchise or nonrenewal of any franchise relationship except on the basis of specifically enumerated grounds and upon compliance with certain notification requirements. 15 U.S.C. §§ 2802(a), (b)(1).

*Brach*, 677 F.2d at 1216 (footnote omitted). The relevant portion of the statute at issue in the present action states in pertinent part:

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

. . . .

(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if—

(i) such determination—

(I) was made after the date such franchise was entered into or renewed, and

(II) was based upon the occurrence of changes in relevant facts and circumstances after such date. . . .

15 U.S.C. § 2802(b)(2)(E). Plaintiffs allege that defendant failed to meet each of the four conditions outlined in this portion of the statute. They assert that Exxon's decision was part of a broader scheme to withdraw from the area, one ultimately linked to the decontrol of petroleum franchising in 1980 and involving the creation of a phony three-year agreement through which Exxon could then comply with the statutory requirements. We address these claims *seriatim.*

**A. Whether the Contracts Were for a Term of Three Years**

 Plaintiffs initially assert that the agreements they had with Exxon were not contracts for three years. Notwithstanding the fact that the documents both plaintiffs signed stated on their face that they were for a three-year term, plaintiffs argue that the agreements were only for a term of two years, ten months, and three days—a period non-inclusive of the retroactive provisions. Furthermore, they assert, the parties were not in agreement as to all of the material terms to be incorporated into the contemplated future contract, such as the amount and cost of the fuel to be delivered. Thus, plaintiffs claim they had no way of knowing whether they were bound by the terms of the previous contract or by new terms. We disagree.

Plaintiffs cite to legislative history of the PMPA, which reiterates that the overriding purpose of the law is to protect franchisees and prevent the " 'leverage effect' over franchisees who do not have the protection of long term contracts." In this case, there is nothing to indicate the use of such leverage. There is no evidence to support plaintiffs' statements that the three years

in the contract were "unilaterally inserted by the franchisor at the time that a franchise was offered by Exxon to the wholesaler." To the contrary, plaintiffs were told that they were going to be offered a three-year franchise, and when it was offered, with the retroactive period plainly included in the contract, they signed it knowingly and willingly. Kentucky law clearly allows parties to a contract to pre-date a contract and both parties will be bound by that agreement. *American Credit Indemnity Co. v. Hecht & Co.*, 137 Ky. 261, 125 S.W. 697, 699 (1910); *accord Brewer v. National Surety Corp.*, 169 F.2d 926, 928 (10th Cir.1948) ("It is competent for the parties to agree that a written contract shall take effect as of a date earlier than that on which it was executed, and when this is done, the parties will be bound by such agreement.")

Similarly, while plaintiffs are correct in their assertion that essential terms of the contract must be agreed upon, it is general contract practice that parties agree to enter into contracts and only later formalize their agreements in writing, using generally understood, or previously employed terms for the new agreement. In the present case, the plaintiffs operated the franchise during the period prior to when the three-year contract was signed with the knowledge that they would be signing a new agreement under the general terms and conditions of the one-year contract.

The March 1981 letter from Exxon alerted the dealers of the pending three-year contract offer and established the temporary amounts of fuel to be provided:

> Three-year contracts for both motor gasoline and diesel fuel will be offered for the period beginning April 1, 1981.
>
> . . . .
>
> To allow time for contract volumes and other details to be worked out, during April and May of 1981, or until your contract is signed if earlier, Exxon will make available to you for purchase,

monthly volumes of motor gasoline and diesel fuel equal to your purchases for each corresponding month in 1980, less any overlifts from the previous month. . . .

> The other terms and conditions of your current contract will govern until the signing of your new contract. Any purchases of Exxon motor gasoline and/or diesel fuel during the period from April 1, 1981 until the signing of your new contract shall indicate your concurrence with these provisions during this interim period.

As soon as the new contract was presented, plaintiffs conformed to the terms of that contract. At no time during the intermittent period did they experience any difficulty based on the claimed lack of agreement on the terms.[1]

We also note that, in arguing before the district court, plaintiffs stated "that after the execution of the Massey franchise and the Lyons' franchise, the terms *then* related back to March 1 [sic] and *after May 28, 1981*, the obligations of the parties were governed thereby." We find this attempted distinction to be without significance. Further, we find plaintiffs' citation to *Straney v. Smith*, 255 S.W.2d 653, 655 (Ky. 1953), to be inapposite. ("There was so much left for future settlement that it cannot be said there was a consummation of an agreement which would have become operative without the formality of executing written memorials thereof. . . .")

## B. Whether the Decision to Withdraw was Made in Good Faith

██ The second prerequisite a franchisor must meet in order to terminate a franchise under the PMPA is for the decision to have been made "in good faith and in the normal course of business. . . ." 15 U.S.C. § 2802(b)(2)(E). In their appeal, plaintiffs raise only the issue of good faith.

---

**1.** We similarly find no need to discuss plaintiffs' challenge to the magistrate's finding that the definition of a contract "would include the oral dealings between Massey and Exxon prior to the execution of the formal written franchise agreement." The actions of the parties and the language of the documents signed by them clearly indicate that there was a firm understanding and agreement between the parties which would allow the post-dating of the contract.

The legislative history states the clear intent behind this statutory language.

> This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary or discriminatory termination ... yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as a market withdrawal, ... is a wise business decision.

S.Rep. No. 731, 95th Cong., 2d Sess. 37, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 896. The test for good faith is one of subjective intent. *See Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1118–20 (D.Conn.1980); *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1222–23 (7th Cir.1982). "So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith." *Baldauf v. Amoco Oil Co.*, 553 F.Supp. 408, 412 (W.D.Mich.1981), *aff'd*, 700 F.2d 326 (6th Cir.1983).

In the present case, the magistrate concluded that Exxon indicated that its "decision to withdraw resulted from sharp changes in the market environment (including a decreased product demand for petroleum products which began to become obvious at the end of 1981 and a loss of company oil concessions in the Middle East), which required Exxon to reduce the amount of oil it refined." The magistrate further concluded that Massey "provided no evidence which would establish that Exxon's decision to withdraw was a sham or an artifice or was a deviation from its normal practice or procedures." In support of its good faith assertions Exxon submitted affidavits of its chairman of its board of directors and its retail business manager. Although plaintiffs concede the content of these affidavits, they assert that three additional factors indicate that the decision was not made in good faith.

Plaintiffs first urge us to consider affidavits purportedly offering evidence that, after the withdrawal, Exxon was still operating in the state. These include the use of Exxon signs and Exxon credit card imprints. The district court rejected this contention and we agree with that conclusion. The sales at issue were not made by Exxon itself, but by independent distributors of gasoline located in Tennessee. The statute governs only the withdrawal "from the marketing of the sale of motor fuel through retail outlets." Absent any indication that Exxon was illicitly coordinating the continued sales of its gasoline, we find no evidence of bad faith.

Moreover, as the magistrate accurately concluded, even if it were demonstrated by these facts that Exxon had "not yet withdrawn completely from the Kentucky market, it has made the 'determination ... to withdraw', [pursuant to] 15 U.S.C. § 2802(b)(2)(E).... It is simply not relevant that withdrawal has not been wholly effected."

Plaintiff also charges that Exxon did not act in good faith because, at the time it was allegedly considering the withdrawal from Kentucky, it was simultaneously inducing its franchisees to purchase from Exxon the land where the service stations were located. As a result, say plaintiffs, the land owners were left with greatly devalued holdings.

Defendants counter that these sales were the result of a company decision to stop distributing its product nationwide through company-wide bulk plants and that this decision was totally unrelated to the later decision to withdraw from the retail sale of gasoline in Kentucky and the five other states in 1982. In this regard, Exxon notes that during the same period that the Kentucky bulk plants were sold Exxon also sold bulk plants in Tennessee and Georgia, two states from which Exxon did not withdraw. We do not find plaintiffs' speculation that these sales related to the with-

drawal to present a genuine issue of material fact.

Finally, plaintiffs suggest that the determination of when the decision to withdraw was actually made evidences defendant's lack of good faith. Plaintiffs offer an affidavit stating that Harold David, the Exxon representative, told R.E. Hawkins, an Exxon station operator in Kentucky, in the fall of 1981, that Exxon "was leaving the State of Kentucky and would no longer be operating in Kentucky." Another affidavit states that Maxine Macy, the surviving widow of a bulk plant operator, was allegedly advised by Mr. Davis in December 1981 that she should not buy a certain piece of Kentucky real estate because Exxon would be withdrawing from the marketing of fuel in Kentucky.

Defendants urge this court to reject these affidavits, citing both their hearsay nature and their minimal probative value. The magistrate concluded that these inferences of bad faith on the part of plaintiffs "are essentially drawn from facts which occurred *after* Massey's franchise was renewed. Therefore, it is concluded that Exxon's decision to withdraw was made after it renewed its franchise agreement with Massey." We agree. There was no evidence that the cancellation was made with "evil intent," *Marks v. Shell Oil Co.,* 643 F.Supp. 1050, 1055 (E.D.Mich.1986), *vacated on other grounds,* 830 F.2d 68 (1987), nor do plaintiffs present any evidence of pretext by Exxon which might explain why the company might not want to renew plaintiffs' franchises.

The party opposing a motion for summary judgment is required by Rule 56(e) to set forth *specific facts* showing that there is a genuine issue for trial, and may not rest on the mere allegations or denials of his pleadings. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Plaintiffs cite the language of *Consumers Petroleum Co. v. Texaco, Inc.,* 804 F.2d 907, 914 (6th Cir.1986), in which the court reversed a summary judgment in a PMPA case, stating: "We can not conclude from reviewing the record that Consumers could not have developed facts to support its assertion that Texaco's decision not to renew the five-year agreement was made in accordance with the requirements of section 2802(b)(2)(E) to create an interim franchise." However, the reason for the court's reversal of summary judgment in *Consumers Petroleum* was the district court's decision not to allow plaintiffs to amend their complaint and its failure even to consider the merits of plaintiffs' amended complaint before denying the motion. No similar abuse of discretion is evident here. Viewing the evidence and drawing all inferences in the light most favorable to the opponent of the moving party we find no material factual dispute. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Marks,* 643 F.Supp. at 1055.

C. Whether Exxon's Determination to Withdraw from Kentucky was Made After the Date of the Franchise Agreements

Finally, plaintiffs contest the validity of the termination of the franchise agreement on the grounds that the determination was not made "after the date such franchise was entered into" and "based upon the occurrence of changes in relevant facts and circumstances after such date." This argument largely overlaps the good faith argument, since it would be clear evidence of Exxon's bad faith if the company entered into new franchise agreements knowing it was doing so simply so it could immediately cancel those agreements.

Exxon's decision to close its operations in Kentucky and the five other states was predicated upon the changed market conditions in those areas. This was clearly demonstrated by the documents Exxon presented during discovery and in its motion for summary judgment. Contrary to plaintiffs' contentions, the actual decision was made only after evaluating the relevant data in August 1982. Their assertion that Exxon used old data from 1972 through 1980 is a specious one. Indeed, figures from those years were for comparison pur-

poses; a perfectly legitimate usage.[2] However, as Exxon's CEO testified, the changes in market conditions did not become evident until late 1981 when the new studies were done. The franchises were renewed in May 1981, a clear indication that the decision to withdraw did not predate the franchise agreement.

### D. The Release Signed by Lyons

■ The final issue before us is whether the district court properly granted summary judgment for Exxon against Lyons on the issue of the release contained in the real estate agreement signed by Lyons on August 10, 1982. That agreement, which was a purchase agreement for the real estate and related equipment at an Exxon Service Station in Grayson County, Kentucky, stated:

> As partial consideration for this transfer, Purchaser by the acceptance of this Bill of Sale releases, indemnifies and agrees to hold harmless Seller from and against any and all existing or future claims and liability, as well as causes of action at law or in equity, for loss, damage, or injury (including death), whether known or unknown, to any persons and property (including but not by way of limitation, Purchaser and the agents, servants, employees and representatives of Purchaser and the property of any of them) whosoever, and from whatsoever cause or source, and whenever arising or occurring, whether past, present or future, and whether from the acquisition or use of said equipment or otherwise, with the exception, however, of the aforesaid defense of the sale of the equipment. Purchaser intends and understands that the foresaid agreement to release, indemnify and hold harmless Seller is to be inclusive of but not limited to, any claims based upon any theory of strict liability,

negligence (excluding only Seller's negligence), or any other theory of liability. Two weeks after Lyons signed this document, Exxon announced that it would be withdrawing from the retail marketing of gasoline in Kentucky. Subsequently, in October, the closing of the service station took place. Lyons attempted to operate the station and made improvements in it. His efforts were unsuccessful, however, and he eventually sold the station at a loss.

Lyons now asserts that the release he signed did not affect his rights as to the franchisor-franchisee relationship, and that he is not barred from asserting his rights under the PMPA to recover his losses because (a) there was no consideration in the release for that exchange, (b) Lyons had insufficient knowledge or means of knowledge to be adequately apprised of the rights he was waiving under the PMPA, and (c) because the release must be interpreted under the law of Kentucky which bars its enforcement. We agree. To apply the release language of this contract concerning the sale of a single gas station to the entire panoply of legal claims and defenses an oil franchisee may have under the broad statutory scheme designed to protect his interests, involves extensive impermissible overreaching.

Exxon had just sold a service station it had previously owned. In order to cut off any liability resulting from its prior ownership of the premises and to protect against future inchoate claims, it used broad release language. This language must be read in the context of a sales agreement, however, and we are unable to construe it as intended to have any effect on the separate and continuing contractual relationship of franchisor and franchisee that existed. We note, however, that because Lyons' claim under the PMPA is virtually

---

**2.** The PMPA states that the decision to withdraw must be based on "the occurrences of *changes* in relevant facts and circumstances" after the date of renewal. In addition, the legislative history of this section clearly indicates that a comparison with earlier figures is appropriate:

> In this regard, it should be noted that a trend may begin prior to the date the franchise was entered into or renewed. Conditions at that time may not justify the determination to withdraw from marketing. Subsequent events may alter the trend in such a manner as to serve as the basis for such a determination. These changes in such a trend may satisfy this statutory requirement.

S.Rep. No. 731, 95th Cong., 2d sess. 34–35, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 893.

identical to Massey's, the same analysis would apply. Accordingly, we affirm the summary judgment as to Lyons, but do so upon the basis of the reasoning applied to Massey's claim.

AFFIRMED.