**PDV MIDWEST REFINING LLC, et. al., Plaintiffs/Counter–Defendants,**

**v.**

**ARMADA OIL & GAS COMPANY, INC., et. al., Defendants/Counter–Plaintiffs and Third–Party Plaintiffs,**

**and**

**UNO–VEN Company et. al., Third–Party Defendants.**

**No. 97–CV–72287–DT.**

United States District Court, E.D. Michigan, Southern Division.

Oct. 1, 1999.

---

1. Although nine months may not be a long time in many courts, in this Court, the average trial track is less than nine months.

Faith E. Gay, Sidney & Austin, New York City, Dane A. Lupo, Lupo & Koczkur, Detroit, MI, for Plaintiff.

Jamal John Hamood, Hamood& fergestrom, Tryo, MI, for Defendant.

### *ORDER GRANTING IN PART & DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT*

WOODS, District Judge.

This matter having come before the Court on Plaintiffs' motion for summary judgment on Counts I, II, III and VI of Plaintiffs' complaint and on Defendants' counter-complaint [Document No. 114];

The Court having reviewed the pleadings submitted herein, and being otherwise fully informed in the matter;

IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment, relating to Plaintiffs' breach of contract and guaranty claims (Counts I and III), shall be, and hereby is, GRANTED IN PART, as Defendants, jointly and severally, are obligated to pay for the petroleum products they received, and DENIED IN PART, as a genuine issue of material fact exists with respect to whether $574,098.93 of the total amount is owed;

Plaintiff's motion for summary judgment on their quantum meruit claim (Count II) shall be, and hereby is, DENIED, because Plaintiffs are entitled to recover under the contract;

Plaintiffs' motion for summary judgment with respect to their fraud claim (Count VI) shall be, and hereby is, DENIED;

Plaintiffs' motion for summary judgment on Count II of Defendants' counterclaim, alleging tortious interference of business relationship, shall be, and hereby is, GRANTED as unopposed; and

Plaintiffs' motion for summary judgment on Count I of Defendants' counterclaim, alleging a violation of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841, shall be, and hereby is, GRANTED IN PART, to the extent that Defendants seek recovery under 15 U.S.C. § 2802(b)(2)(E)(iii)(II) because the uncontroverted facts establish that recovery is not warranted on that ground;

The remainder of Plaintiffs' motion for summary judgment on Defendants' PMPA counterclaim is DENIED, without prejudice.

## I. BACKGROUND

On May 14, 1997, Plaintiffs PDV Midwest Refining LLC ("PDV") and CITGO Petroleum Corporation ("CITGO") filed an eight-count verified complaint alleging that Defendant corporation Armada Oil and Gas Company ("Armada") and individual Defendants Allie Berry ("Berry"), Ali Jawad ("Jawad") and Sam Haddas ("Haddas") obtained petroleum products through fraudulent means and failed to pay for over $3 million worth of petroleum products. Subsequently, on July 3, 1997, De-

fendants filed a counterclaim and third-party complaint alleging that both Plaintiffs and Third–Party Defendants UNO–VEN Company (hereinafter "UNO–VEN") and Union Oil Company of California (hereinafter "Unocal") violated the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.*, and Plaintiff CITGO and Third–Party Defendant Knight Enterprises, Inc., interfered with Defendants' business expectations and relationships.[1]

Individual Defendant Jawad purchased Armada, which operated as an unbranded gasoline distributor, or "jobber," in 1982.[2] Armada supplied unbranded gasoline products to retail gas stations until 1990. On July 31, 1990, Armada executed a Marketer Sales Agreement ("Agreement") with UNO–VEN, which was renewed in 1995.[3] Under the Agreement, Armada agreed to operate as a branded distributor for Unocal (or "76"–brand) motor fuels and lubricants. It is uncontroverted that Armada did not lease any premises from UNO–VEN; Armada only purchased petroleum products. Section 14 of the Agreement governed the terms of Armada's payment for the gasoline products. *See* Plfs.' Ex. B(1), the Agreement.[4] On July 31, 1990, individual Defendants Berry, Jawad and Haddas entered a written personal guaranty for Armada's obligations under the Agreement. *See* Plfs.' Ex. B(2), guaranty attached to DeVore Declaration. Currently, Jawad is the president and treasurer of Armada. *See* Jawad dep. at 10. Berry has served as Armada's vice-president and secretary for approximately ten years. *Id.*

On April 18, 1997, Plaintiff CITGO sent a letter to all UNO–VEN distributors, including Armada, indicating that as of May

---

1. By Order dated February 10, 1999, Third–Party Defendant Knight Enterprises was dismissed from this action. The remaining Third–Party Defendants, UNO–VEN and Unocal, were dismissed on August 30, 1999.

2. Jawad has served as the president of Armada since 1982. *See* Plfs.' Ex. A, Jawad dep. at 6.

3. Armada entered a series of marketer sales agreements with UNO–VEN, the duration of

which lasted from 1990 through 1998. *See* Plfs.' Ex. B, DeVore Declaration at ¶ 2.

4. Also under the Agreement, any retail gas stations receiving products from Armada were obligated to participate in UNO–VEN's credit card program, and accept valid Union 76 credit cards, as well as other approved credit cards. *See* Agreement at § 18.

1, 1997, "UNO–VEN's refining and marketing assets will be transferred to an indirect subsidiary of Petroleos de Venezuela, S.A. [Plaintiff PDV]." Plfs.' Ex. C(2). Also on that date, Plaintiff CITGO became operator of both UNO–VEN's Lemont refinery and its terminals and lubricant facilities. *Id.* The letter also indicated that Plaintiff CITGO would administer all UNO–VEN Agreements for a one-year period, starting May 1, 1997, and continue to supply Unocal branded products during that time. *Id.* Armada was also informed that during this one-year period, it could "continue to use the Unocal and '76' Marks, and accept the Union 76 credit card." *Id.*

Subsequently, on April 30, 1997, UNO–VEN sent a letter to Berry, reiterating the facts supplied in CITGO's earlier letter. Additionally, UNO–VEN explained:

> Because Unocal will no longer have an interest in the refining and marketing assets, UNO–VEN's right to use the Unocal and 76 trademarks and credit card will be terminated.
>
> ... As a consequence of the transaction ... and as a result of the termination of UNO–VEN's right to use the Unocal and 76 trademarks and credit card, UNO–VEN hereby terminates and/or non-renews said Marketer Sales Agreement and does hereby terminate and/or non-renew any franchise relationship, effective as of May 1, 1998, one year from today's date. All agreements relating to the Marketer Sales Agreement are also hereby terminated and non-renewed as of the effective date, May 1, 1998.

Ex. B(3).

In response to the letters sent by CITGO and UNO–VEN, Armada sent a memorandum to its customers indicating that Armada's franchise agreement with UNO–VEN was terminated on May 1, 1997, not the May 1, 1998, date provided in CITGO's and UNO–VEN's letters. *See* Ex. D, Berry dep. at 56–59 & memo attached as D(2). Armada also expressed that:

> Most important is our position that UNO–VEN's statement for terminating your franchises, "loss of right to grant the use of the trademark which is the subject of the franchise."
>
> The most important aspect of this memo is to urge you NOT to sign any agreement with any competitor before you talk to us, for entering into a new BP franchise.
>
> Effective May 15, 1997, we (Armada Oil & Gas Co.) will not accept UNO–VEN or other credit cards processed thru UNO–VEN POS machines ...

Ex. D(2) (emphasis in original).

The parties do not dispute that subsequent to April 18, 1997, but before CITGO began administering UNO–VEN's Agreement, Armada continued to acquire petroleum products through UNO–VEN's distribution terminals. Plaintiffs contend that between April 14 and April 30, Armada had conducted several hundred transactions, but failed to honor the eleven electronic transfer drafts submitted by UNO–VEN. *See* Galloway Decl. at ¶ 4 & Ex. C(2). Plaintiffs contend that during this period, Armada purchased and failed to pay for products in the amount of $2,412,-657.82. *Id.* After May 1, 1997, when CITGO began administering the Agreement, Armada continued to acquire petroleum products and continued to refuse payment for the electronic fund transfer drafts submitted by CITGO, in the amount of $652,-729.31. *See* Galloway Decl. at ¶¶ 7–8 & Ex. C(5). After May 7, 1997, CITGO supplied petroleum "on a cash-on-delivery basis only." Galloway Decl. at ¶ 11. Plaintiffs have demanded payment for all of the purchases from both Armada and individual Defendants under the Guaranty. Defendants dispute the precise amount that is due, but admit that they have not proffered payment for these purchases.

Currently before this Court is Plaintiffs' motion for summary judgment on Counts I, II, III, and VI of their complaint, and both counts of Defendants' counter-complaint.

## II. LEGAL STANDARD

Rule 56 mandates the entry of summary judgment if all the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the burden of showing that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. Thus, this Court determines "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir.1996) (citations omitted). This Court does not weigh the evidence but determines whether there is a genuine issue for trial, viewing the record as a whole and viewing all the facts in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In order to avoid summary judgment, the opposing party must have set out sufficient evidence in the record to allow a reasonable jury to find for him at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256, 106 S.Ct. 2505. Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir.1994).

## III. DISCUSSION

### A. Count I—Breach of Contract

■ Plaintiffs currently seek $3,065,387.13 against Defendant Armada for failure to pay for petroleum products supplied to Defendants under the parties' Agreement. *See* Galloway Decl. at ¶ 9.[5] The Court applies Illinois law to resolve the dispute because the Agreement specifies that Illinois law governs any dispute under the Agreement. *See* Agreement at ¶ 31(d). Armada admits that it has not paid for the petroleum products it purchased from UNO–VEN and its successor, CITGO. *See* Defs.' Br. at 13. Defendants incorrectly assert, however, that their breach is excused because of Plaintiffs' alleged violation of the Petroleum Marketing Practice Act ("PMPA"), 15 U.S.C. §§ 2801–06.

■ Plaintiffs assert, and Defendants do not disagree, that Plaintiffs must show the following to establish a breach of contract under Illinois law: "[the existence of] a valid contract, plaintiff's performance, defendant's breach and damages." *CGE Ford Heights, L.L.C.L. v. Miller*, 306 Ill. App.3d 431, 239 Ill.Dec. 477, 714 N.E.2d 35, 41 (1999) (citing *Elson v. State Farm Fire & Cas. Co.*, 295 Ill.App.3d 1, 6, 229 Ill.Dec. 334, 691 N.E.2d 807, 811 (1998)).

It is undisputed that the Agreement between UNO–VEN and Armada was valid and enforceable, and that UNO–VEN assigned the Agreement to PDV. It is also undisputed that PDV retained CITGO to administer the Agreement. Further, Armada admits that it accepted, but did not pay for, these petroleum products. *See* Defs.' Br. at 13. It is clear, therefore, that Armada is obligated to pay under the Agreement.

Defendants alternatively argue that summary judgment is not appropriate because Plaintiffs misstate the amount due. Defendants contend that Plaintiffs over-

---

5. Plaintiffs explain that this figure is smaller than the amount specified in their complaint because CITGO received credit card payments from Armada's customers that were not subject to Armada's approval for some of the purchases. Galloway Decl. at ¶ 10.

state liability by $574,098.93 by failing to subtract: (1) credit card sales, (2) two disputed credit charge backs, (3) amounts earned in marketer incentive programs, and (4) shared advertising revenue. *See* Defs.' Br. at 13–15. Defendants submit the affidavits of their accountant, Nawal Zqaihi, and individual Defendant Berry to support Defendants' claim that Plaintiffs overstated Defendants' liability. In response, Plaintiffs submit a supplemental declaration of James Galloway, in which Galloway counters that Defendants' averments are incorrect. *See* Galloway Supp. Decl. at ¶¶ 2–7.

■ Defendants first contend that Plaintiffs failed to credit $234,961.76 in credit card sales. *See* Defs.' Ex. B, Berry Aff. at ¶ 17. Defendants failed to produce evidence other than Berry's and Zqaihi's conclusory statements. Although Zqaihi asserts that her conclusion was derived "as a result of [an] examination [of] Plaintiffs' documentation," Defs.' Ex. L, Zqaihi Aff. at ¶ 8, Defendants do not reveal how they came to this conclusion, or identify the portion of Plaintiffs' documents that supports their claim. Although Defendants' evidence is not sufficient to support summary judgment in their favor, it is sufficient to create a fact issue precluding Plaintiffs' request for summary judgment as to the $234,961.76 that Defendants claim Plaintiffs failed to credit.

■ Defendants next contend that they have contested two charge backs totaling $47,142.55, and argue that this amount should not be included. *See* Berry Aff. at ¶ 12; and Defs.' Ex. N, Statement of Account. It appears that the charge backs either represent sales that were prohibited by the credit card agreement or charges that were not paid by the ultimate credit card user. *See* Defs.' Ex. I, Galloway dep. at 22; Galloway Supp.Decl. at ¶ 5. Defendants disagree. It is equally unclear whether the time for making a charge back expired. *See* Galloway dep. at 23–24. Thus, a material fact question remains with respect to whether Defendants are obligated to pay this $47,142.55 in charge backs under the parties' Agreement.

■ Defendants also contend that they are entitled to credits under the market incentive program for the last three quarters of 1997, from April 1997 through March 1998, and also for April 1998. Specifically, Defendants assert that they are entitled to credits in the amount of $225,712.32 and $10,423.30 respectively, under the market incentive program. *See* Berry Aff. at ¶ 14. Plaintiffs counter that Defendants were not eligible for incentives for either time period because Defendants did not meet the threshold purchase volumes. *See* Galloway Supp.Decl. at ¶ 6. Plaintiffs neither identify the volumes required nor produce evidence illustrating that this volume was not met. Thus, the dispute, on the current record, can be resolved only by assessing the credibility of the witnesses. The Court cannot engage in such findings on summary judgment. *See Matsushita*, 475 U.S. at 578, 106 S.Ct. 1348.

In their brief, Defendants last contend that they are entitled to $55,859 for shared revenue advertising expenses. Plaintiffs contend, however, that Defendants never submitted the appropriate documentation in order to obtain reimbursement. *See* Galloway Supp.Decl. at ¶ 7. From these submissions, however sparse they may be, it is clear that the Court cannot resolve this issue on summary judgment.

In sum, although Defendants fail to establish that they are entitled to summary judgment on the amount they allege constitutes an overcharge, they have produced sufficient evidence to create a genuine issue of material fact with respect to the contested amounts only. Thus, in order to resolve the dispute, the Court would be required to engage in credibility findings. Because this issue can be resolved only by assessing the credibility of the witnesses and by weighing the evidence, it must be decided by the trier of fact at trial and not by this Court on a motion for summary judgment. *See Matsushita*, 475 U.S. at

578, 106 S.Ct. 1348. Accordingly, Plaintiffs' are entitled to partial summary judgment in their favor for the undisputed balance of $2,738,097.14, as it is undisputed that Defendants breached the Agreement by not paying for all the petroleum products they purchased. Whether Defendants are obligated to pay all, a portion, or none of the remaining $574,098.93 is left for the trier of fact at trial.

### B. Count II—Quantum Meruit

■ Count II of Plaintiffs' complaint seeks recovery against Defendant Armada for the $3,312,196.07 in petroleum products received by Armada under the theory of quantum meruit. The Court's finding above, that Plaintiffs are entitled to recover under the parties' contract, disposes of their quantum meruit claim: "Illinois does not permit recovery on a theory of quasi-contract when a real contract governs the parties' relations." *Murray v. Abt Associates, Inc.*, 18 F.3d 1376, 1379 (7th Cir.1994) (applying Illinois law) (internal citations omitted). The Court has ruled above that Defendants are obligated under the contract. Therefore, Plaintiffs are not entitled to recovery under a theory of quantum meruit, and the Court thus denies Plaintiffs' motion for summary judgment on this count.

### C. Count III—Guaranty

Plaintiffs also contend that they are entitled to summary judgment against the individual Defendants for the amounts owed, because the individual Defendants executed a Guaranty providing that they "jointly and severally, unconditionally agree to pay to UNO–VEN such sum or sums of money ... become due to UNO–VEN...." Ex. B(2). The Guaranty explicitly specifies that it "inure[s] to the benefit of and be binding upon the ... successors and assigns of UNO–VEN." *Id.*

■ Defendants first argue that the 1990 Guaranty was released. Defendants suggest that because the Guaranty was not "reaffirmed" when Defendants renewed their Agreement with UNO–VEN in 1995, the Guaranty did not continue. Although the Guaranty specified that it could be terminated at any time, the Guaranty explicitly requires that Defendants must provide:

> ... notice in writing to UNO–VEN to that effect, together with payment to UNO–VEN of the amount of money, if any, for the time being owing by Debtor to UNO–VEN. Notice of termination of this Guaranty Agreement shall not be effective until written notice has been received by UNO–VEN's Commercial Credit Department at 1850 East Golf Road, Schaumburg, Illinois 60196.

*Id.* Accordingly, under the explicit terms of the Guaranty, there was no requirement that Defendants reaffirm the 1990 Guaranty in order for it to remain effective.

■ Defendants next contend that even if the Guaranty was not released, it should be disregarded. Notwithstanding the plain language of the Guaranty, Defendants argue that the Guaranty limited Defendants' total liability to $250,000. Defendants arrive at this figure by subtracting the $500,000 letter of credit from the $750,000 line of credit which was provided at the time the Agreement was entered. Neither the language of the Guaranty nor any pertinent case law supports such a strained reading. Indeed, Defendants failed to cite, nor could they cite, support for such a novel interpretation.

Defendants next contend that Plaintiffs, in essence, extended Defendants' credit beyond the $750,000 agreed by the parties by continuing to supply Defendants with petroleum products notwithstanding Defendants' failure to pay previous balances. They assert that this action thus released them from the Guaranty. Defendants misconstrue the Michigan Court of Appeals' decision in *Wilson Leasing Co. v. Seaway Pharmacal Corp.*, 53 Mich.App. 359, 220 N.W.2d 83 (Mich.Ct.App.1974). The *Wilson* court held that when the plaintiff materially altered the principal contract, a lease agreement, the material alteration

released the individual defendants from their obligations as guarantors. *Id.* at 369–70, 220 N.W.2d 83.

Here, Plaintiffs did not materially alter the underlying contract between Plaintiffs and Defendants. Because there was no material alteration in the Agreement that would adversely affect Defendants' obligations as guarantors, Defendants' reliance upon *Wilson* is entirely misplaced.

In short, the Guaranty is enforceable, and Plaintiffs are entitled to summary judgment on this claim. Consistent with the conclusion reached above, Plaintiffs are entitled to summary judgment against the individual Defendants only on the undisputed portion of the amount due under the Agreement, not the $574,098.93 disputed by Defendants.

### D. Count VI—Fraud

Plaintiffs also contend that they are entitled to summary judgment because Defendants Armada and Berry are guilty of fraud. Plaintiffs argue that their claim of fraud is established because Armada had no intention of paying for any petroleum products after receiving CITGO's April 18, 1997, letter. In order to establish an action for fraud, Plaintiffs must show:

(1) that the defendant made a material representation, (2) that the representation was false, (3) that when the defendant made the representation, it was known to be false, or was made recklessly, without any knowledge of its truth and was made as a positive assertion, (4) that the defendant made the representation with the intention that it should be acted on by the plaintiff, (5) that the plaintiff acted in reliance on it, and (6) that the plaintiff suffered damages as a result.

*H.J. Tucker & Assoc., Inc. v. Allied Chucker & Engineering Co.,* 234 Mich. App. 550, 595 N.W.2d 176, 187 (1999) (citations omitted). Additionally, a "claim for 'silent fraud' requires a plaintiff to set forth a more complex set of proofs." *M & D, Inc. v. W.B. McConkey,* 231 Mich.App. 22, 28, 585 N.W.2d 33 (Mich.Ct.App.1998). Under Michigan law, "a claim of silent fraud is established when there is a suppression of material facts and there is a legal or equitable duty of disclosure." *Id.* at 36, 585 N.W.2d 33.[6] Not surprisingly, Defendants deny that they ever defrauded Plaintiffs.

This Court, having reviewed and considered the limited record evidence before it, cannot state that the facts are so one-sided that a reasonable jury could return only a verdict in favor of Plaintiffs on their fraud claim. This claim, which bears substantially on Defendants' motives and intent, is simply not ripe for summary judgment. Thus, the fact finder at trial must decide who should prevail on this claim.

### E. Count I of Counterclaim—PMPA

Plaintiffs also contend that they are entitled to summary judgment on Count I of Defendants' counterclaim, which alleges that Plaintiffs terminated Defendants' jobbership in violation of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841. In their counterclaim, Defendants contend that:

The termination of Armada's jobbership as of May, 1988 [sic—1998] was not based upon, and not even alleged to be based upon, any grounds permitted under the Petroleum Marketing Practices Act. . . .

Counterclaim at ¶ 15. Defendants assert that they believe Plaintiffs' reason for ter-

---

**6.** The Court is not entirely convinced that Michigan, as opposed to Illinois, law governs this tort claim. Regardless, the Court's analysis would be the same under either state's law, as both states recognize that silence can constitute actionable fraud: "Mere silence in a transaction does not amount to fraud. . . . Silence accompanied by deceptive conduct or suppression of material facts, however, can give rise to concealment and 'it is then the duty of the party which has concealed information to speak.' " *Hirsch v. Feuer,* 299 Ill. App.3d 1076, 1086, 234 Ill.Dec. 99, 702 N.E.2d 265, 273 (1998) (internal citations omitted).

mination was UNO–VEN's withdrawal from the geographic market. *See* Counterclaim at ¶ 16. Defendants contend that UNO–VEN's withdrawal was merely a sham and thus violative of the PMPA. *Id.* at ¶ 17. Defendants alternatively contend that even if the transaction was not a sham, a PMPA violation still exists because Plaintiffs, as the purchasers, "failed to offer Armada a jobbership on the same terms and conditions as the Counter–Defendants other jobberships in Michigan." *Id.* at ¶ 18.

■ Recognizing that franchisors wielded a great deal of bargaining power as compared to franchisees, Congress enacted the PMPA to protect franchisees from arbitrary or discriminatory terminations. *See* S.Rep. No. 95–731, 95th Cong.2d Sess. 15–19, *reprinted in* 1978 U.S.C.C.A.N. 873, 874–77; *Massey v. Exxon Corp.*, 942 F.2d 340, 342 (6th Cir.1991). Nevertheless, the Sixth Circuit has cautioned that the PMPA "should not be interpreted to reach beyond its original language and purpose." *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir.1989).

■ The parties agree that the PMPA allows a franchisor to terminate or not renew a franchise based on certain enumerated grounds, provided that the termination also complies with PMPA's notice provisions. *See* 15 U.S.C. § 2802(b)(1)(A–B) & (b)(2–3). It is undisputed that the franchise was terminated. Thus, Plaintiffs have the onus to show that termination was proper pursuant to one of the grounds enumerated by the PMPA. As the Sixth Circuit explains:

> The Act imposes upon the franchisee the initial burden of showing that the franchise has been terminated or not renewed. [*Massey*, 942 F.2d at 342.] 15 U.S.C.A. § 2805(c). The burden then shifts to the franchisor to establish as an affirmative defense that such termination or nonrenewal was permissible under the Act. *See id.*

*Evans v. Marathon Oil Co.*, 1999 WL 137633 at *2 (6th Cir. Mar.2, 1999).

■ Plaintiffs contend that Defendants' claim under the PMPA must fail for several reasons. First, Plaintiffs assert that Defendants incorrectly argue that UNO–VEN failed to identify the reason for terminating the Agreement as required under the PMPA. This Court agrees. Plaintiffs' April 30, 1997, letter to Defendants explicitly and unequivocally states, in relevant part:

> *In compliance with the provisions of the Petroleum Marketing Practices Act, you are hereby notified that the grounds for the above action [termination of the Agreement effective May 1, 1998] are that:*

> 1. An event has occurred which is relevant to the franchise relationship and as a result of which termination of the franchise and non-renewal of the franchise is reasonable.

> 2. UNO–VEN has lost the right to grant the use of the trademark which is the subject of the franchise.

Plfs.' Ex. B(3) (emphasis added). Although Plaintiffs did not provide the specific statutory section of the PMPA paraphrased in the letter, it is clear that Plaintiffs rely upon Sections 2802(b)(2)(C) and 2802(c)(6).

■ Notwithstanding Defendants' claim that the termination was premised on UNO–VEN's withdrawal from the geographic market, the Court first addresses whether termination on the ground asserted by Plaintiffs, loss of the right to use the Unocal and 76 trademarks, comports with the PMPA. Section 2802(b)(2)(C) states, in pertinent part:

> The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—(i) not more than 120 days prior to the date on which notification of termination or nonrenewal

is given, if notification is given pursuant to section 2804(a)....

§ 2802(b)(2)(C)(i). Section 2802(c), in turn, defines events constituting a reasonable termination or nonrenewal to include:

loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor....

§ 2802(c)(6).

Defendants first contend that a voluntary divestiture of a trademark does not qualify as a "loss" under Section 2802(c)(6). Plaintiffs rely upon the Second Circuit's decision in *Russo v. Texaco, Inc.*, 808 F.2d 221 (2d Cir.1986), to support their claim that a voluntary divestiture qualifies as a loss. The Court of Appeals held that the defendant's transfer of the Getty name and mark was a critical factor in determining an event relevant to the franchise relationship as set forth under Section 2802(b)(2)(C). *Id.* at 226. Although the *Russo* court ultimately deemed the defendant's loss of trademark rights to be involuntary, *id.* at 227, Defendants incorrectly identify as dictum the *Russo* court's initial ruling that "the word 'loss' as used in § 2802(c) is intended to cover voluntary as well as involuntary situations." *Id.* The *Russo* court explicitly rejected the plaintiff's contention that the defendant's divestiture of the Getty trademark does not fit within Section 2802(c) "on two grounds:" (1) Consistent with the intent and other statutory provisions of the PMPA, Section 2802(c) applies for both voluntary and involuntary losses of a trademark; and (2) notwithstanding the private agreement between the defendant and Power Test, the purchaser of the Getty mark, Texaco's loss of trademark rights should be considered involuntary in light of the Federal Trade Commission's divestiture order. *Id.* at 227–28.

Defendants rely on an unpublished order of the Eastern District of Wisconsin for the proposition that a voluntary loss does not qualify as a loss contemplated by Section 2802(c). *See Draeger Oil Co. v. The UNO–VEN Co.*, Case No. 99–C–317 (E.D.Wis. Aug. 4, 1999). Defendants' reliance on this decision is misplaced. The *Draeger* court, ruling on a motion to dismiss, expressed only that because a question exists regarding whether a voluntary sale of a trademark constitutes a loss under Section 2802(c), dismissal under the more lenient Rule 12(b)(6) standard was not appropriate.

Furthermore, this Court respectfully disagrees with the preliminary conclusion on this issue reached by the *Draeger* court. Although the courts that have ruled that a "loss" can be a voluntary event dealt with other provisions of the PMPA, *see generally Hutchens v. Eli Roberts Oil Co.*, 838 F.2d 1138, 1141–42 (11th Cir.1988); *Lugar v. Texaco, Inc.*, 755 F.2d 53, 56 (3d Cir. 1985), the Second Circuit correctly observed that:

It is a settled principle of statutory construction that "[w]hen the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in the next place."

*Russo*, 808 F.2d at 227 (citations omitted). *See also National Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 501, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *First City Bank v. National Credit Union Admin. Bd.*, 111 F.3d 433, 438 (6th Cir. 1997), *cert. denied*, 522 U.S. 1146, 118 S.Ct. 1162, 140 L.Ed.2d 174 (1998).

▪ Finally, as for Defendants' and the *Draeger* court's contention that *Lugar*, *supra*, and *Veracka v. Shell Oil Co.*, 655 F.2d 445 (1st Cir.1981) are "of questionable authority" in light of Congress' 1994 amendments to the PMPA, this Court notes that although Congress did amend Section 2802(c)(4) to require a franchisor to offer to assign to the franchisee any

**848**

option to extend the lease or option to purchase the premises, *see* PMPA Amendments of 1994, Pub.L. No. 103–371, sec. 3, § 102(c)(4), 108 Stat. 3484 (codified at 15 U.S.C. § 2802(c)(4)(B) (West Supp.1996)), it did not alter the *Lugar* and *Veracka* courts' underlying rationale, namely that a voluntary loss constitutes a proper event making termination reasonable under Section 2802(c). When Congress wished to deal with what a franchisor must do before terminating a franchise based on the non-renewal of an option, the factual scenario presented in *Lugar* and *Veracka,* Congress only dealt with this specific concern. Congress did not take the route available to it of amending the statutory language to limit covered events to involuntary and not voluntary losses. Nothing in the text of the amendments or in the accompanying legislative history, *see* H.R .Rep. No. 103–737 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2779; S.Rep. No. 103–387 (1994), *reprinted at* 1994 WL 534750; 140 Cong.Rec. H10575–01 (daily ed. Oct. 3, 1994); 140 Cong.Rec. H10735–01 (daily ed. Oct. 4, 1994); 140 Cong.Rec. S14236–02 (daily ed. Oct. 5, 1994), demonstrates an intent to redefine or change what type of loss of lease, i.e., voluntary or involuntary, satisfies Section 2802(b)(2)(C). Therefore, even though the result reached in *Lugar* may no longer be the law under the PMPA because the franchisor must additionally offer "any option to extend the underlying lease or option to purchase the marketing premise that is held by the franchisor," before terminating the franchise, there is no reason to doubt that *Lugar* and *Veracka* remain the standard with respect to their interpretation of the meaning of the term "loss." [7]

■ Even accepting Plaintiffs' contention that a voluntary loss of a trademark

suffices under Section 2802(c) of the PMPA, Plaintiffs additionally must show that they "first acquired actual or constructive knowledge of such occurrence ... not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a)." § 2802(b)(2)(C)(i). Defendants argue that Plaintiffs fell outside this time period, arguing that Plaintiffs knew of the loss of franchise rights in December 1996. *See* Sedlacek dep. at 60–61. Plaintiffs alternatively suggest that they acquired knowledge of the trademark loss on May 1, 1997, *see* DeVore Decl. at ¶¶ 4–5, or sometime in late March or early April 1997. *See* Plfs.' Ex. H, Conners dep. at 35–36. A review of the submissions reveals that Plaintiffs have failed to submit evidence from which this Court could unequivocally ascertain when Plaintiffs acquired knowledge regarding the loss of trademark rights. As set forth above, Plaintiffs bear the burden of establishing their affirmative defense and, similarly, their entitlement to summary judgment on this basis. Accordingly, Plaintiffs' motion for summary judgment on the PMPA claim must be denied.

■ Defendants alternatively maintain that despite Plaintiffs' claim that the termination was premised on the loss of the use of the trademarks, the termination was actually premised upon UNO–VEN's withdrawal from the geographic market. Plaintiffs counter that summary judgment is still appropriate even if the termination had been grounded on a withdrawal from the geographic market because the PMPA authorizes termination on this basis. *See* 15 U.S.C. § 2802(b)(2)(E).[8]

Although the PMPA authorizes terminations based on a franchisor's decision to

---

**7.** The Court additionally notes that if the franchisor does not have an option to extend the lease or an option to purchase the marketing premise, the 1994 PMPA amendment is not implicated.

**8.** The Court additionally observes that Defendants presented sufficient evidence to create a

fact question with respect to whether Plaintiffs' termination was premised on the reason they articulated, loss of the use of the trademark, or the reason Defendants cite—a decision to withdraw from the geographic market. *See, e.g.,* Defs.' Ex. H, Sedlacek dep. at 136–37.

withdraw from a geographic market, certain preconditions must be met. First, the franchisor's decision must be made "in good faith and in the normal course of business." *See* § 2802(b)(2)(E). Second, the decision must be made subsequent to the date the franchise was renewed and based on "changes in relevant facts and circumstances" that transpired after the franchise was renewed. *See* § 2802(b)(2)(E)(i)(I–II). Additionally, the termination cannot be "for the purpose of converting the [franchise] premises … to operation by employees or agents of the franchisor for such franchisor's own account." *See* § 2802(b)(2)(E)(ii).

 The Court notes that the question of a franchisor's good faith is a subjective inquiry. *See Massey*, 942 F.2d at 345. *Accord, Duff v. Marathon Petroleum Co.*, 51 F.3d 741, 744 (7th Cir.1995). This requirement is designed to prevent sham determinations from being used as artifice for nonrenewal. *See Massey*, 942 F.2d at 345 (quoting legislative history of the PMPA); *Duff*, 51 F.3d at 744. The second inquiry under § 2802(b)(2)(E) requires an examination of the franchisor's normal decision-making process. *See* Duff, 51 F.3d at 744. The PMPA does not, however, give the courts the authority to evaluate the wisdom of business decisions. *See Massey*, 942 F.2d at 345; *Duff*, 51 F.3d at 744.

 In the present case, Plaintiffs did not present evidence from which the Court could summarily conclude that the decision was calculated in good faith and in the normal course of business. Plaintiffs have not produced evidence from which this Court could find, pursuant to Fed.R.Civ.P. 56, that the uncontroverted facts are so one-sided that Plaintiffs must prevail as a matter of law. *See Terry Barr*, 96 F.3d at

178. Thus, Plaintiffs are not entitled to summary judgment on this ground.

 Defendants' also assert that liability under the PMPA attaches because Plaintiffs failed to offer Armada a jobbership under the terms as others possessing franchises from Plaintiffs. Plaintiffs counter that Defendants' claim fails because they misconstrue the PMPA provision upon which they base their claim.[9] This Court agrees. The PMPA provision Defendants apparently rely upon, 15 U.S.C. § 2802(b)(2)(E)(iii)(II), applies only to leased marketing premises, and it is uncontroverted that Defendants did not lease premises from UNO–VEN. *See, e.g.*, DeVore Decl. at ¶ 2. Accordingly, Defendants cannot seek recourse under this provision, and Plaintiffs are entitled to summary judgment as to this aspect of Defendants' counterclaim.

### F. Count II of Counterclaim—Tortious Interference

 Plaintiffs lastly contend that they are entitled to summary judgment on Count II of Defendants' counterclaim. In their counterclaim, Defendants allege that CITGO and former Third–Party Defendant Knight Enterprises tortiously interfered with the contracts between Armada and its retail dealers by obtaining a temporary restraining order ("TRO") with this Court. Defendants fail to provide any argument with respect to why Plaintiffs are not entitled to summary judgment on this claim. The Court further notes that Defendants' counterclaim repeatedly incorrectly avers that the "TRO [was] improperly obtained." *See, e.g.* Counterclaim at ¶ 28. To the contrary, Plaintiffs properly sought relief, which was granted by this Court. It is immaterial that the parties later agreed to dissolve the TRO. Plain-

---

9. Under the PMPA, a franchisor purchasing a preexisting franchise must offer a franchise to a terminated franchisee, under the same terms offered to its current franchisees, provided that: (1) the original franchisor terminated the franchise because of a withdrawal from the market, (2) the franchisee's opera-

tion is located on premises leased by the franchisor, and (3) the original franchisor assigned or transferred its interest in the premises along with its interest in other marketing premises to the second franchisor. *See* 15 U.S.C. § 2802(b)(2)(E)(iii)(II).

tiffs' reliance on the Michigan Court of Appeals' opinion in *Early Detection Center, P.C. v. New York Life Ins. Co.*, 157 Mich.App. 618, 403 N.W.2d 830 (Mich.Ct. App.1986), is well placed. As the *Early Detection* court stated:

> Plaintiffs' allegations with regard to this claim were essentially that, by filing a groundless suit, the defendants interfered with their medical business. However, in order to succeed under a claim of tortious interference with a business relationship, the plaintiffs must allege that the interferer did something illegal, unethical or fraudulent. *Weitting v. McFeeters*, 104 Mich.App. 188, 198, 304 N.W.2d 525 (1981). *There is nothing illegal, unethical or fraudulent in filing a lawsuit, whether groundless or not.* No actionable claim was stated under this count.

*Id.*, 157 Mich.App. at 631, 403 N.W.2d at 836.

 It is well settled that:

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. *Lakeshore Community Hosp. v. Perry*, 212 Mich.App. 396, 401, 538 N.W.2d 24 (1995). To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. *Feldman v. Green*, 138 Mich.App. 360, 369, 360 N.W.2d 881 (1984). Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference. *Michigan Podiatric Medical Ass'n v. Nat'l Foot Care Program,*

*Inc.*, 175 Mich.App. 723, 736, 438 N.W.2d 349 (1989).

*BPS Clinical Lab. v. Blue Cross & Blue Shield of Michigan,* 217 Mich.App. 687, 698–99, 552 N.W.2d 919 (1996), *appeal denied,* 456 Mich. 881, 570 N.W.2d 782 (1997), *and cert. denied,* 522 U.S. 1153, 118 S.Ct. 1178, 140 L.Ed.2d 186 (1998).[10] Defendants provided no response to Plaintiffs' motion on this claim. Accordingly, this Court is satisfied that Defendants' claim of tortious interference with business relations should be dismissed on Plaintiffs' unopposed motion for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment with respect to their claims for breach of contract and guaranty. (Counts I and III) is GRANTED IN PART, as Defendants, pursuant to the contract with Defendant Armada and via the Guaranty executed by individual Defendants, are obligated to pay for the petroleum products they received, and DENIED IN PART, as a genuine issue of material fact exists with respect to whether $574,098.93 of the total amount asserted by Plaintiffs is due.

Accordingly, Plaintiff's motion for summary judgment on their quantum meruit claim (Count II) is DENIED, as this Court finds that Plaintiffs are entitled to recover under the contract.

Plaintiffs' motion for summary judgment with respect to their fraud claim (Count VI) is DENIED, as genuine issues of material fact remain.

Plaintiffs' motion for summary judgment on Count II of Defendants' counterclaim, alleging tortious interference of business relationship, is GRANTED as unopposed.

Plaintiffs' motion for summary judgment on Count I of Defendants' counterclaim, alleging a violation of the PMPA, is GRANTED IN PART, to the extent that

---

**10.** Illinois law applies the same analysis. *See generally, Turner v. Fletcher,* 302 Ill.App.3d 1051, 1058, 235 Ill.Dec. 959, 706 N.E.2d 514, 519 (1999) (tortious interference with contract).

Defendants seek recovery under 15 U.S.C. § 2802(b)(2)(E)(iii)(II) because the uncontroverted facts establish that recovery is not warranted on that ground.

The remainder of Plaintiffs' motion for summary judgment on Defendants' PMPA counterclaim is DENIED, without prejudice.

IT IS SO ORDERED.